# WM. McGEORGE JR., ET AL. v. SELLERS HOFFMAN.

APPEAL BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS OF DELAWARE COUNTY.

Argued February 10, 1890—Decided March 24, 1890.
[To be reported.]

1. The fact that a landowner has made complaint to the owner of a mill dam on an adjoining tract, that the water in the dam is raised to too great a height, unaccompanied by any interference with the use of the water by the mill owner, the bringing of any suit against him, or the making of any adjustment with him, is not evidence of the existence of any controversy such as would affect the acquisition by user of a right to maintain the water at the height complained of.

2. The extent of such an easement, acquired by long continued user, is measured by the extent to which the servient tenement is overflowed; and the height of the water at its ordinary level, as compared with known water-marks, and the extent of land covered by it at its ordinary stages, are proper evidence upon the question whether the mill owner has acquired by adverse user the right to raise the water in his dam to a particular height: Gehman v. Erdman, 105 Pa. 371, explained.

Statement of Facts.

3. While there is no statute that gives title to the easement of flooding the land of another by adverse user, the fact that in charging the jury the court inadvertently made reference to the statute of limitations as giving such a title, intending to refer to the well-established rule of law under which adverse user for twenty-one years does confer title to the easement, in strict analogy to that statute, could do no harm and was not ground for reversal.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 124 July Term 1889, Sup. Ct.; court below, No. 74 March Term 1888, C. P.

On February 14, 1888, William McGeorge, Jr., and others, executors and trustees under the will of Thomas Kent, deceased, brought trespass against Sellers Hoffman, to recover damages for the alleged unlawful maintenance of a mill dam by the defendant, at such a height as to injure the land of the plaintiffs and interfere with the operation of plaintiffs' mills thereon. The defendant pleaded not guilty and the bar of the statute of limitations.

At the trial on December 21, 1888, the following facts were shown: In 1812, Joseph Hibberd was the owner of a mill on the north side of Darby creek, known as the Union Mills, and David Evans owned a mill on the south side, known as the Rockbourne Mills. By subsequent conveyances both these properties became vested in Thomas Kent, the plaintiffs' testator. Farther down the stream was a mill which was owned in 1872 by Asher Lobb, and is now owned by the defendant.

By a deed dated May 16, 1812, Joseph Hibberd and wife granted to Asher Lobb, " the right, liberty and privilege of erecting a dam across Darby creek, and of abutting the same against the land of the said Joseph Hibberd and Hannah, his wife, in the township of Upper Darby aforesaid, at the large rocks next below the meadow formerly occupied by James Black, and of raising and swelling the water of the said creek as high as opposite a beech tree, corner of the lands of the said Asher Lobb and David Evans, and no higher."

In 1816, while the ownership of the respective mill properties remained the same as in 1812, a dispute respecting the extent of Lobb's water right arose, and was referred to Joseph

Statement of Facts.

Ball, Oborn Levis and Thomas Steel, who made their award in writing, signed by them, as follows:

"Whereas, a dispute hath arisen between Asher Lobb, on the one part, and Joseph Hibberd and David Evans, on the other part, respecting a right to dam or pen the water in Darby creek, the said parties have by their verbal submission referred said dispute to the final determination of Joseph Ball, Oborn Levis and Thomas Steel; whereupon we, the subscribers, after having examined their claims, heard their allegations and duly considered the same, are of opinion that Asher Lobb has a right to dam or pen the water in the aforesaid creek up to the centre of a hole bored in a rock that lays in said creek, about twenty-five feet below the line between Asher Lobb and David Evans, and that he has no right to dam or pen the water any higher. Witness our hands this 10th day of the seventh Month, 1816."

In 1833, Thomas Garrett, who was then the owner of the Union Mills, brought suit against Asher Lobb for maintaining his dam too high. That suit on August 15, 1835, was compromised by an agreement providing as follows:

"The plaintiff is to grant and the defendant is to receive a lease, rendering a rent of one cent per annum, from this date up to the expiration of the lease from Asher Lobb to Bernard McCredy, say up to 8th of October, 1836, for the use of the power of the waters of the creek between the centre of the hole in the rock and the present height of Asher Lobb's dam; the said dam, as soon as may be after the expiration of the said lease, to be so reduced that the water in the creek at common water shall come up to the centre of the hole in the rock made by Thomas Steel, Oborn Levis and Joseph Ball and no higher."

In 1846, Charles Kelly, then the owner of the defendant's property, built a larger dam-breast farther down the creek than the one erected by Lobb, the purpose being to retain a larger amount of water. Soon after the building of that dam, a dispute arose between Kelly and the owners of the mills above, respecting the height to which he was entitled to raise the water in the dam, he claiming that the rock in which the hole had been drilled in 1816 had tilted or settled, and that that hole did not correctly mark the limit of his right. A meeting of the parties, their attorneys and engineers, was held upon the ground, and a new water mark was made upon another rock.

About 1870, according to the testimony of two witnesses, Thomas Kent complained that the water in the large dam was too high. In consequence of this complaint a search was made for the water mark of 1846, but it had disappeared. Another witness fixed the time of Kent's complaint as late as 1873, after the destruction of the large dam by a freshet which occurred in that year. Upon the washing out of the dam in 1873, the original dam-breast was repaired and put in use. In 1877 about eight or ten feet of it was washed away, but it was immediately restored. Again, in 1881, it was partially destroyed and rebuilt.

Testimony for the plaintiffs tended to prove that since sometime between 1867 and 1870 the water in the defendant's dam had been maintained at a level of about eight inches above the hole in the rock bored by Ball, Levis and Steel, in 1816, and that the backwater from it extended up to and beyond the tail races of the plaintiffs' mills, interfering with their operations. Testimony for the defendant tended to show that the rock mentioned in the agreement of 1816 was unstable and had settled down or tilted, and that the water in the defendant's dam had been maintained at its present height for more than twenty-one years prior to the beginning of this suit.

At the close of the testimony the court, CLAYTON, P. J., charged the jury in part as follows:

Our experience, gentlemen, and the experience of old teaches us that time is a great destroyer not only of human monuments but even of the monuments of nature. . . . . Now, this is unfortunately the difficulty in this case. These marks that the parties have selected, they no doubt intended to be permanent, but they appear, some of them at least, to have changed, even in the short space of a lifetime. The tree now stands farther up from the water, and instead of being now a young, thrifty tree, is an old, dead and withered stump, or I take it to be so from the photograph I have seen. You have seen it. This appears to be the tree referred to in the deed; or, possibly, there may have been some other tree, but the probability is that this is the tree which was referred to. It was then but six feet from the water; now it is sixteen. The rock of which we have heard so much, the rock with the hole in it,

Charge of Court below.

I presume, is the rock mentioned, is about twenty-five feet
from the tree; into it the parties bored the hole, intending that
to be a remaining monument to settle all disputes between
them.   But now, it is alleged that the rock was not permanent,
and that it has either sunk, moved or tilted, so as to change the
hole and make it lower than it was when the mark was origi-
nally made.   But, unfortunately, also, while the parties may
have agreed positively, clearly and precisely as to what their
rights were in 1816 and in 1835 and 1836, the law admits what
is called an uninterrupted user for twenty-one years to obliter-
ate the most stable monuments man can establish; and, while
it may be that the rock has not moved, or tilted, or sunk, yet
it may be that that is not the mark, that that does not indicate
the height to which the defendant is entitled to maintain his
water.   [And while you may therefore find that these marks
have not changed, yet, if you find that for a period of twenty-
one years the waters of that dam have been maintained at the
height they now are, continuously, uninterruptedly, adversely
for twenty-one years, the law as firmly settles that right as if
the parties had reduced it to writing and established it by the
most solemn monuments, deeds and documents.] [2] . . . .

Now, understand me, gentlemen, it will not be necessary for
you to encumber your mind by reciting the titles of these par-
ties beyond 1836.   In 1836 their rights were well defined and
could be established with precision.   There was an award
made at that time, and it was agreed that the hole in the rock
that had been made as far back as 1816 was the proper line,
the proper mark for the height of the water.   In 1835 the
award was made and was submitted to by the parties.   That
award was just as binding as the verdict of a jury would have
been, if made at that time.   They then adopted the hole in the
rock.   They not only adopted the rock, but they adopted the
hole in the rock that had been made in 1816.   So you need not
go beyond 1836.   One year was given to lower the water, for
it seems that the water at that time was too high; how much
too high does not appear, but one year was given to lower the
water.   The probability is that it was done; they were here
no more; no complaints were made until at a more recent
period.

[Now, gentlemen, let me repeat, then, the first question for

Charge of Court below.

you to consider. Adopting the line of 1836 as the mark, has the defendant between that time and the commencement of this suit, for an uninterrupted period of twenty-one years maintained the water at its present height? If you find that he has, you need go no further. It will not be necessary for you to consider any other mark or any other line. The law gives him as good a title to maintain the dam and the water at that height, as if the parties had agreed upon it by deeds. In fact, the law presumes that there has been a grant of that right.] [2] Now that will be the first question, and I would advise you to take that question up first, because if you find that question in favor of the defendant, it is an end of the case and you need go no further; your verdict will simply be for the defendant.

Now if you should find that question against the defendant and in favor of the plaintiffs; that is to say, if you should find that there has not been, between 1836 and the time of the commencement of this suit, an uninterrupted period of twenty-one years during which the defendant has continuously and adversely maintained his right to have the water at its present height, then you will have to take up and grapple with the main question which is equally as difficult and unsatisfactory. That question will be: Are there any well established land marks or water marks by which you can ascertain to a reasonable certainty to what height the defendant is entitled to maintain the water of his dam? Centreing around this question and bearing materially upon it, will be this rock in the creek about twenty-five feet from the beech tree, with a hole in it.

You will then direct your attention to that rock and if you come to the conclusion that that rock has not sunk, or has not tilted, or has not moved, then that rock and that hole ought to be the water mark to the height of which the defendant may maintain the water of that dam. Now, understand, always remembering that the first question must be disposed of adversely to the defendant before you take up the second question, because if you should find the first question in his favor, that there had been twenty-one years uninterrupted and continuous user, then the land-marks have nothing to do with it, the present line of the water must control the case; but, having found that point against him, then you will proceed to say whether this rock with the hole in it is sufficiently permanent;

Charge of Court below.

whether it is now where it was in 1836; and, if you find that
it is, then your verdict ought to be for the plaintiffs. Now,
gentlemen, that is all there is in the case. . . . .

[From 1836 to 1873—1835 is when the award was made—and
one year afterward, from 1836 until 1873 there does not appear
to have been any very serious disputes between these parties.
Now, remember, 1836 is one year after the award fixing the
hole in the rock as the mark. In 1846 the big dam was built,
when the old dam which was in existence when the hole in the
rock was bored appears to have been abandoned, and a large
dam built farther down the creek and called the big dam.
Now, about the waters of the big dam the witnesses differ. The
witnesses upon the part of the defendant say that it filled the
dam completely up and covered what they call the old dam,
except the stepping stones. I suppose that it raised the water
at least as high as the old dam raised it. And then you come
to the period of 1873 when the big dam was washed away and
the old dam was then brought into use again, repaired and
used. Then some disputes were raised between the parties.
They did not amount to a lawsuit. There was some talk, there
were some complaints, but there was no action taken either to
have the dam lowered or raised.][1] [The effect of the big
dam, and the height of the water, have a material bearing upon
the old dam. If you find that it did, when up to its usual
height, overflow the breast of the big dam or of the old dam,
then unless the old dam has been raised, there ought to be no
dispute about the height of the water to which the defendant
was entitled to raise his dam or keep his water. Now, this
old dam, as I remember it, was washed away in 1877. If I am
not correct you will remember. And in 1881 about twenty-
five feet of it was washed out, which was repaired in 1882, and
that is the time when the principal dispute commenced, as I
understand.][3] The defendant alleges that when he repaired
the dam he did not raise it, but kept it down some two or three
inches below what he was entitled to have it. The plaintiffs
allege that that dam has been made too high by several inches.
If you find that the hole in the rock was correct, that would
indicate how much too high it was; if the hole in the rock is
not correct, you will have to find out yourselves how much too
high it is. So you see, the next subordinate question in the

Charge of Court below.

case is whether the dam, when repaired in 1882, was built higher than the level of the water, as maintained in the dam of 1846, and, if it was, then the plaintiffs would be entitled to a verdict, providing that you find that the statute has not run against his claim. . . . . [Now let me repeat in brief. Just consider whether the statute of limitations has barred the plaintiff's case; that is to say, just consider whether for a period of twenty-one years continuously since 1836 to the commencement of this suit or at any time between those dates, the defendant has adversely, continuously and uninterruptedly maintained the water of his dam at its present height. If you find that he has, as I said before, that is an end of the case; it is not worth while to consider the subordinate question; you will find your verdict for the defendant.] [2] . . . . .

The plaintiffs request the court to charge:

2. The defendant has no right to swell the waters of Darby creek any higher than opposite the beech tree, unless he has shown that, for a period of twenty-one years and upwards, he or his predecessors in title, under a claim of right, have openly, continuously and uninterruptedly maintained their dam of the same height, whilst the plaintiffs or those under whom they claim were under no disability to resist.

Answer: That point I substantially affirm. It has placed the matter perhaps a little too broad. He has no right, unless the statute or some agreement or covenant between the parties has given him a right, and that will be for the jury to consider, whether there has been an abandonment of the beech tree as the water mark.[5]

3. The fact that the dam of the defendant has been washed away and rebuilt, and that the big dam has been washed away, during the period of controversy between the parties, show such change in the height of the water as should require very satisfactory proof of a continuous maintenance of the water at the height claimed by the defendant.

Answer: Well, gentlemen, I cannot say to you that it requires more than satisfactory proof. The proof ought to be satisfactory that those old marks have been abandoned, or that they have been obliterated or changed. There ought to be proof satisfactory to the jury. I will not say to you that the proof ought to be absolutely conclusive. It should be such as is necessary to satisfy your minds of the fact.[6]

Charge of Court below.

4. If the jury believe from the testimony of plaintiffs' witnesses, to wit: Henry Taylor, Edward Pilling, Joseph Bowers, Thomas McGoldrick, John Jones and Alfred Fowler, that, up to a period between 1866 and 1870 the tail races of the plaintiffs' mills were dry when the mills were stopped, that there were stepping stones, a ford and a crossing log existing, showing the depth of the water lower than it stood at the commencement of this suit, then the dam of the defendant could not have been maintained by his predecessors at its present height.

Answer: Well, this point is argumentative. It is not a question of law to be answered by the court; it is a conclusion to be drawn from the testimony, and I say to you that all the testimony and the evidence in the case is for you; it is not for the court. You should consider the testimony on both sides upon the point raised by this fourth point of the plaintiffs and from the evidence, as well the evidence of the defendant as the testimony of the plaintiffs, you should come to a satisfactory conclusion upon that question, as to what the height of the water was before the commencement of this suit and since 1866, named in the point. The court ought not to be asked to find questions of fact from the testimony, or to arrive at conclusions of fact by reasoning upon the testimony. That is for the jury.[7]

The defendant requests the court to charge:

4. The arbitration of 1816 and the agreement of 1835 are sufficient evidence to warrant the jury in concluding that the beech tree had for some reason been abandoned and discontinued as a water mark; and the evidence produced by the defendant tending to show the establishment of a new water mark, about the time of the erection of the large dam, is sufficient, if believed, to warrant the jury in finding that fact, and this, although the new water mark may have disappeared.

Answer: Well, gentlemen, there is no doubt, of course, about that. I don't suppose it can be controverted that the jury have the right, under all the evidence, to come to any conclusion that the evidence will warrant; but I can't say that there is evidence. There is evidence, but I can't say what effect it will have upon the jury. There is some evidence that the beech tree has been abandoned, otherwise why would the

### Charge of Court below.

other mark be made? These are all questions that commend themselves to our common sense, and if the jury come to the conclusion that these water marks have been abandoned, or for any other reason that they are not satisfactory, they have the right to reject them. In other words, all the testimony and the evidence bearing upon these marks are for the jury, and I leave them with you without binding instructions one way or the other. It strikes me that the case is sufficiently uncertain without the interference of the court to make it more so, and whatever the jury do, or whatever your verdict may be, will be altogether satisfactory. It is just that kind of a case. It just depends upon that much uncertainty that your verdict may be one way or the other, and whatever it is, the probability is that it may be correct. So far as the court is concerned, I have come to no conclusion, and if I had it would not be binding upon you.[8]

5. If the jury find that the defendant and those under whom he claims have openly, continuously and uninterruptedly, under a claim of right, during a period of twenty-one years, maintained the water of the creek at an ordinary level as high as the ordinary level of the water at the present time, or higher, he has the right to continue to so maintain it irrespective of any prior grants or water marks, supposed or real, and the breaking of the dam by a freshet, or any lowering of the level of the water for repairs or other temporary purpose, is not such an interruption as will prevent the acquirement of such right.

Answer: I affirm that point without qualification. That is undoubtedly the law.[9]

6. If the jury find that Charles Kelly, uninterruptedly under a claim of law, maintained the water of the creek, from the date of the erection of the large dam in 1846 until its destruction in 1873, or continuously during twenty-one years of that period, as high as its ordinary level during the ownership of the defendant, it is sufficient to authorize a verdict for the defendant, without regard to the previous water marks and agreements respecting the same.

Answer: That is also affirmed.[10]

7. Any continuous, adverse and uninterrupted maintenance by defendant and those under whom he holds title, of the water of the creek as high at its ordinary level as at the present time

Charge of Court below.

or higher, during any period of twenty-one years or upwards, is presumptive evidence of title to so maintain it, and such title, after it has become perfect by adverse user, is not lost by non-user for a period of less than twenty-one years. A mere temporary interruption by the breaking of the dam by freshets, or for repairs or like temporary purpose, will not prevent the acquirement of such right.

Answer: I so charge you.[11]

—The jury being recalled, were instructed further:

It is our special desire that this verdict should be conclusive forever of all disputes between these parties about this water right, and I do not intend that your verdict shall be imperiled by any opinion of the court upon a question of fact. The counsel for the plaintiffs has complained of something I have said which he thinks may have undue weight with you. He says that I said to you that there had been no dispute about the height of the water in what was called the big dam, the dam of 1846. I only want to say to you that whatever disputes the parties had, the jury may consider them. If you find that there were disputes about the dam of 1846 between or among the parties, you will give the testimony bearing upon the subject its due weight. . . . .

A juror: Will a dispute between the parties during any time between the twenty-one years be the same as a suit that had been brought?

By the court: No sir. A mere dispute of words has nothing to do with the running of the statute; that is, while there is an adverse holding. If I say I have this right and the other party says I have not, that does not affect the running of the statute. You must bring your action or take adverse possession and interrupt it in that way; and that is the only way it can be interrupted; not a mere battle of words, it must be more than that. You see the law requires that the holding should be adverse. The very idea of an adverse holding is one that indicates adverse user. Still, the possession being uninterrupted, the statute runs; but if the user is interrupted, then the statute will not run. But a mere wordy dispute will not stop the running of the statute; it must be more than that.

The jury rendered a verdict in favor of the defendant. A

Arguments.

rule for a new trial having been discharged, judgment was entered on the verdict, when the plaintiffs took this appeal, assigning for error :

1–3. The parts of the charge embraced in [ ] [1 to 3]

5–7. The answers to plaintiffs' points.[5 to 7]

8–11. The answer to defendant's points.[8 to 11]

*Mr. E. H. Hall* and *Mr. W. Ward,* for the appellants :

1. The questions involved in this case were three : (1) Whether the defendant had maintained his dam at a height greater than was his right under the grant to his predecessors in title ; (2) Whether, if so, he was entitled to maintain the dam at its present height by reason of adverse user for twenty-one years; and (3) Whether it had been raised within the twenty-one years preceding the suit. What was known as the big dam was built in 1846 and washed out in 1873. Hence, if there was no change in its height, a title by prescription was obtained by the owners of the defendant's property. Accordingly, the plaintiffs endeavored to prove that that dam was raised between 1868 and 1870, by showing that about that period the water was raised at their mills, and that about 1870 there were complaints about the height of the dam. The instruction referred to in the first assignment of error directed the minds of the jury from the real cause of complaint, the raising of the water between 1868 and 1870, and the further instructions when the jury were called back, did not remedy its damaging effect.

2. The court misled the jury by directing their attention away from the pivotal points in the case. But two questions were submitted to them, viz., the stability of the landmarks, and title by prescription or adverse user. The period of time between 1867 and 1870, during which, as we endeavored to prove, the raising of the dam occurred, was not referred to in the charge. The judge's summary of the case is strictly in accordance with the defendant's theory that there was no change in the height of the dam that was washed away in 1873, and no reference is made to the plaintiff's case, except that part referring to the grant and the rock, and the charge improperly tends to throw discredit upon the stability of the rock. The wrong thus done to the plaintiffs should be corrected : Bovard

Arguments.

v. Christy, 14 Pa. 267; Bisbing v. Bank, 93 Pa. 79. While
it was the intention of the court to leave the whole case to the
jury without any prejudicial instructions, we submit that the
plaintiffs did not receive the even handed justice to which they
were entitled.

3. The direction to find whether the waters of the dam had
been maintained at their present height for twenty-one years
was erroneous. Although the right of the defendant, under
the express grant to his predecessors, is measured by the height
of the water at the tree and the rock, the true rule upon the
subject of the acquisition of an additional right by prescription
is just the reverse, the right so acquired being measured by the
height of the dam structure continuously maintained for twenty-
one years: Gehman v. Erdman, 105 Pa. 371. Moreover, the
points of the defendant upon this subject, which the court
affirmed, were all based upon the maintenance of the water at
its ordinary level. This can mean only the average level:
McCoy v. Danley, 20 Pa. 91, per Mr. Justice LOWRIE. The
court was wrong, for this reason, in affirming those points.
And to what statute did the court refer, in its answer to the
plaintiffs' second point? There is no statute giving title to an
incorporeal hereditament by adverse user. That answer left
the jury without adequate instructions upon the question pro-
pounded, and is therefore ground for reversal: Duncan v. Sher-
man, 121 Pa. 520. The same is true of the answer to plaintiffs'
third point.

*Mr. A. Lewis Smith*, for the appellee:

1. The objection made to the language of the charge respect-
ing the acquisition of a prescriptive right, is based upon an
entire misapprehension of what was decided in Gehman v.
Erdman, 105 Pa. 371. In that case, the defendant had proved
the maintenance of his dam-breast at the same height during
the prescriptive period, but the court below, notwithstanding
that fact, had used language gauging his right by the depth of
the water above it, a thing which, as this court said, is neces-
sarily inconstant and variable. Height and depth are not con-
vertible terms, even in lexicography, and the language of the
court in Gehman v. Erdman, will not bear the interpretation
sought to be placed upon it by the appellants.

2. It cannot be doubted that if I back water upon my neighbor, adversely and under claim of right, for twenty-one years, I acquire an easement to continue to do so at the same level, though the dam-breast upon my own land has been changed and has not always occupied the same spot, provided the same mill site has been maintained : Angell on Water-courses, § 338 *b ;* Stackpole v. Curtis, 32 Me. 383 ; Carlisle v. Cooper, 6 C. E. Green 576. The same principle is deducible from Brown v. Bush, 45 Pa. 61. It follows that the easement thus acquired is to be measured by the level of the water upon the servient tenement, not by the height of the dam on the dominant one : Carlisle v. Cooper, supra ; Horner v. Stillwell, 35 N. J. L. 307 ; Burnham v. Kempton, 44 N. H. 78 ; Gilford v. Lake Co., 52 N. H. 262 ; Angell on Water-courses, 379 ; Mertz v. Dorney, 25 Pa. 519. The case last cited does not appear to have been called to the attention of the court in Gehman v. Erdman.

OPINION, MR. JUSTICE CLARK :

The plaintiffs in this case, who are the executors and trustees under the will of Thomas Kent, deceased, represent the owners of the Union and of the Rockbourne Mills, the former on the north, and the latter on the south side of Darby creek, in Delaware county. The defendant is the owner of a mill below, on the same stream, and the complaint is, that the defendant's dam backs the water of Darby creek into the tail-race of the plaintiffs' mills, thereby impeding their successful operation.

Thomas Kent derived title to the Union Mills under the deed of Joseph Hibberd to Thomas Garrett, dated February 11, 1822, and to the Rockbourne Mills under deed of David Evans to Samuel Garrett, dated December 16, 1831. Sellers Hoffman claims title to the land under Asher Lobb, whose title originated in a deed from John Davis dated April 1, 1799, and to the water right under Joseph Hibberd, who while he was the owner of the upper, and Lobb of the lower tract, by deed dated May 16, 1812, granted to Lobb " the right, liberty, and privilege of erecting a dam across Darby creek, and of abutting the same against the land of the said Joseph Hibberd and Hannah, his wife, in the township of Upper Darby aforesaid, at the large rocks next below the meadow formerly occupied by James Black, and raising and swelling the water of the said creek as

Opinion of the Court.

high as opposite a beech tree, corner of the lands of the said Asher Lobb and David Evans, and no higher."

The rights of the respective parties, so far as they related to the raising of the waters of Darby creek by the defendant's dam, originated in this grant. It seems, however, that about the year 1816, the extent of Lobb's right came into dispute between Lobb and Evans; and they referred the matter to Joseph Ball, Oborn Levis and Thomas Steel, three of their neighbors, who bored a hole in a rock in the bed of the creek, and fixed the centre of that hole as the proper height to which Lobb might raise the water.

In 1833, Thomas Garrett brought suit against Asher Lobb for raising the water and flooding his race; when that case came to trial in 1835, it seems to have been conceded that the water was raised higher than the hole in the rock, and higher than the defendant had any right to raise it; this dispute was settled, however, the defendant agreeing to pay a nominal sum, annually, " for the use of the power of the waters " of the creek between the centre of the hole in the rock and the height of the dam; " the said dam, as soon as may be after the expiration of the said lease, to be so reduced that the water in the creek, at common water, shall come up to the centre of the hole in the rock made by Thomas Steel, Oborn Levis, and Joseph Ball, and no higher."

In 1846, Charles Kelly, who was then the owner of the lower or Hoffman Mills, built a dam below the present site, for the purpose of retaining a larger supply of water, and at that time made some kind of a water mark in the rocks at the breast of the present dam, but this mark has disappeared. In 1873, the new dam was washed out, and was not rebuilt. The old dam was put in repairs, however; and was maintained until in 1877, when it was partially driven out, and was again repaired. This occurred again in 1881, and in 1882 the dam was restored, and has since remained.

The proofs would seem to show that the creek " at common water " is now about eight inches above the hole in the rock made in 1816; and the plaintiffs' contention is that this is in excess of the defendant's right, and that the water is backed up into the tail race of their mills, to their injury, etc.

The last adjustment of the defendant's rights, therefore,

would seem to have been made in 1835, when it was agreed that the centre of the hole in the rock was the rightful and proper mark defining the height to which the waters of this dam, in the ordinary stages, might be raised; and it is fair to infer that in 1836 the dam was adjusted to its proper height, as there seems to have been no complaint to the contrary, nor is it pretended otherwise. There certainly was no " very serious dispute" between the parties from 1836 to 1873. In 1868, 1869, or 1870, Kent is said to have complained that the water was too high, and Kelly sent a man to see whether there was any cause for complaint; others heard there was some dispute about that time, as to the height of the water, but had no personal knowledge of the facts. It does not appear that there was any work done on the dam, or that the height of the water was increased by this or any other means during these years. There certainly was no interference with Kelly's use of the water; no suit was brought, no adjustment made; in fact, there was no evidence of any such dispute as could have had any effect whatever in this case. But, even if there had been evidence of this character, the court, when the jury was recalled, submitted that question in the fullest and fairest manner.

The defendant's further contention is, that although the water in its ordinary stages, at the time of the bringing of this suit, was admittedly several inches above the centre of the hole in the rock, yet it was in fact no higher than it had at all times been since the agreement of 1835; that the rock was not permanent, and since that year had sunk or tilted over; and that the hole which was bored into it as a water mark does not represent the proper height to which the defendant, by the agreement of 1835, was entitled to maintain his dam. The defendant further contended that the present height of the water is the same as it was in 1836, and that it has since that time continuously, and without interruption, been so maintained, under adverse claim of right; and there was evidence adduced in support of both of these propositions. These questions of fact were, we think, carefully and accurately submitted to the jury, and the verdict must be taken to have established one or other of them in favor of the defendant.

The case of Gehman v. Erdman, 105 Pa. 371, is cited, as

distinguishing between the effect of the testimony as to the
height of the water and the height of the dam, in controversies
of this character. In that case, as we there said, " the defend-
ant contended, and called witnesses to show, that the dam was
built in the year 1843, and that since that time, and for twenty-
one years prior to the bringing of the suit, it had been main-
tained in precisely the same form, and to the same and no
greater height; that the structure was identically the same, in
all respects, at the time when the suit was brought, as it had
been at any time during the twenty-one years prior to that
time, and that this long-continued enjoyment of the easement
or water privilege, under the facts and circumstances of the
case, raised a legal presumption of a corresponding grant, and
of his right to hold it." There was nothing to rebut this proof,
but testimony as to the height of the water at different times
and under varying circumstances, and the opinions of witnesses
as to what was the depth, at ordinary stages of the water. In
this condition of the proofs we said: " If the defendant, or
those under whom he claims, for a period of twenty-one years
before suit brought, under a claim of right, openly, continuous-
ly, and uninterruptedly maintained his dam, the breast-wall or
structure of which was at all times during that period of the
same height, while the owner and possessor of the lands upon
which the reservoir and race were located was under no disa-
bility to resist the use, the law will presume a grant of the
easement, the extent of which is to be measured, not by the
actual or average depth of the water at any given point, but
by the nature and extent of the obstruction itself. The depth
of the water, even in such a basin, is necessarily inconstant and
variable ; but the height of the dam structure is fixed and cer-
tain, and readily ascertainable." It must be conceded that,
owing to the changing condition of the stream from rain and
drought, the ascertainment of the extent of an easement, by
the height of the water alone, is difficult; so difficult, in some
cases at least, as to render the ascertainment, in any exact sense,
impracticable, if not impossible. What is the ordinary stage
or level of a stream of water, or of a pool supplied by a stream,
may be a matter of opinion merely. As Mr. Justice LOWRIE
said in McCoy v. Danley, 20 Pa. 91, that depends upon the
seasons and the weather, and it is a matter about which people

Opinion of the Court.

differ; but the dam is a permanent and fixed structure, and, when its proper height is agreed upon or otherwise established, as long as its elevation is actually unchanged it affords the most satisfactory proof of the level to which the water may be raised.

It is certainly true that the presumption of a grant, arising from long-continued user, applies to the land occupied, and not to the dam, and the extent of the easement is measured by the extent to which the servient tenement is overflowed; but as long as the dam structure is of the same height, it may be assumed, in most cases at least, that the water is held to the same general level, and the extent of the land flooded from time to time is the same. The height of the water at what may be considered its ordinary level, as compared with known water marks, and the extent of land covered by the water at its ordinary stages from time to time, are proper evidence, of course, in this class of cases; but if it clearly appear that the dam-breast, through a period of twenty-one years prior to the time of the complaint, has been in fact unchanged, variations in the depth of the water, during the continuance, after that, of the structure, at the same height, may be fairly attributed to the varying condition of the stream, or the evidence thereof to a difference of opinion as to what is the ordinary stage of the water. This is what we meant to say in Gehman v. Erdman, supra, and what was there said was applicable to the special facts of that case.

The reference to the statute, as giving title to the easement, was a mere inadvertence, which could have done no harm. While there is no statute that gives title to an easement of this character by adverse user, there is a well-established rule of law to that effect, in strict analogy to the statute of limitations, and this was what the court referred to. We think this case was very fully and fairly tried in the court below. Upon an examination of the whole case we find no error. The charge contains a very clear, correct, and satisfactory statement of the law, and an impartial review of the facts. We have not considered the assignments of error in detail, nor in their order, but we have disposed of all the questions which may be supposed to arise out of the evidence.

The judgment is affirmed.