## OREGON CONSTRUCTION CO. v. ALLEN DITCH CO.

### [69 Pac. 455.]

Waters for Irrigation—Privity With Appropriators.

1. Where persons who divert water do not surrender their rights to a company, but it is organized merely to facilitate distribution of the water among them, there is such a privity as to enable it to defend in their behalf.

Prescriptive Right to Water.

2. As against riparian owners, one who diverts water may acquire title by prescription in the same time necessary to acquire title to land by adverse possession.

Use of Water—Appropriation—Title by Relation.

3. When the appropriation of a water right is initiated by the posting of a notice, the statute of limitations will begin to run at the date of the posting of such notice (*Nevada Ditch Co.* v. *Bennett,* 30 Or. 59, cited), but when it is initiated by an actual diversion without a notice, the statute is set in motion on the date of the diversion, provided in both instances that there is an application to a beneficial use within a reasonable time.

Prescription—When Statute of Limitations Begins.

4. Prescription begins to run from the time one diverts water, though there is not then an actual use thereof, provided there is actual and exclusive possession and control with intent to use it, followed by actual use within a reasonable time.

Adverse Use—Effect of Objections.

5. Continuity of holding by persons who divert water is not interrupted by objection being made thereto, no attention being made to the objection.

Continuity of Adverse Holding.

6. There is no interruption of the continuity of holding of persons who divert water because others make a diversion by a canal into which for a while their water flows for a short distance, they again taking up the water and using it in defiance of the others' claims.

From Umatilla: William R. Ellis, Judge.

Suit for an injunction by the Oregon Land & Construction Co. against the Allen Ditch Co. Decree for plaintiff, and defendant appeals.                                 Reversed.

For appellant there was a brief over the name of *Carter & Raley,* with an oral argument by *Mr. J. H. Raley.*

For respondent there was a brief over the names of *Williams, Wood & Linthicum,* and *Jas. A. Fee,* with an oral argument by *Mr. Geo. H. Williams.*

41 Or.—14.

Mr. Justice Wolverton delivered the opinion.

The plaintiff being the owner of 1,520 acres of land through which the Umatilla River, a nonnavigable stream, flows, seeks to enjoin the defendant from diverting any of the water thereof in disregard of its riparian rights. Formerly a slough at the mouth of Alkali Canyon, near the center of section 21, township 3 north, range 29 east, extended from the river in a northwesterly direction for one fourth to a half mile, skirting a rocky bluff in a semicircular form. About the year 1865 one Lowe and his brother constructed a ditch for some distance, to be used for floating logs and mining purposes, taking the water out of the northernmost end of the slough. What use was eventually made of it does not appear, and the brothers finally abandoned the enterprise. On the 12th of December, 1891, there was incorporated by M. C. Tribble, O. Teel, and Henry Baumgardner a company known as the Umatilla Meadows & Butter Creek Co., the initial purpose thereof being to build and construct a canal or canals for a system of irrigation on the Umatilla Meadows and Butter Creek lands in Umatilla County. The meadows are situated below the head of the proposed canal, along and to the west of the Umatilla River, extending down to the lands of the plaintiff, some five or six miles below, and Butter Creek is some eight or ten miles distant to the west and northwest. A portion of the canal was constructed in 1891 and 1892, the exact extent of which does not appear. For some distance below the mouth of the Lowe Ditch it occupied the identical course, but was extended along the slough, and connected directly with the river at the mouth of Alkali Canyon. Water was diverted through this ditch, and some use made of it from that source. A little later the Columbia Valley Land & Irrigation Co., a corporation of which W. W. Caviness was the president, constructed a large canal by increasing the capacity of the Meadow Ditch from its head down to what is known as the "drop" in the former, about a quarter of a mile below the head of the Lowe Ditch, from which it diverged, and continued in its own route

westward for a distance of six or seven miles; but the project was never completed. Water was turned into it in 1892, and the same use made of it in that year and the year following, when it was abandoned, and has since fallen into disuse. The Allen Ditch Co., defendant, having incorporated October 12, 1892, with O. Teel, M. C. Tribble, and M. T. Allen, as incorporators, subsequently constructed a ditch from the drop to the river, intersecting it 288 feet below the head of the Columbia Valley Ditch. Below the drop it utilized the Meadows Ditch, perhaps as far as the latter was constructed, and continued upon the lines of the old Lowe Ditch. At some distance below the drop the ditch divided into two branches, one running near the river for a distance of three miles or more from the head, and the other to the westward for a distance of about four miles.

No privity of estate has been shown between any of the incorporations, and no attempt has been made to establish any, except there is some evidence that the Columbia Valley Co. purchased the right of way of the Meadows Ditch, and the parties owning the latter became interested to some extent in the former. J. H. Koontz testifies that he transferred his stock to the Columbia Valley Co. in consideration of an agreement upon its part to furnish him 140 inches of water for irrigation. He was then living on the place subsequently purchased by Fred Andrews. Later he became interested in the Allen Ditch, and used the water, as needed, from all three of the company ditches; and when he sold to Andrews assigned to him his interest in the Allen Ditch. The plaintiff contends that no water was ever used through any of these ditches prior to 1890, and not until within ten years of the time this suit was instituted, to wit, May 5, 1900. The defendant's title is based upon a prescriptive right,—that is diversion and adverse user for a period of more than ten years last past,—and that constitutes the principal question in the case. The defendant does not claim to be the owner of the water, or have any right to use it, but that it is a managing concern for its better control and distribution among those entitled to it. There was an attempt

by the company to make an appropriation in 1892, but all title through that source is abandoned, and the sole reliance for present title is based on a prescriptive right or usage for more than ten years by individual citizens having an interest in the company. These claimants are Moses Tribble, Fred Andrews, M. T. Allen, Elvira Teel, B. F. McCullough, C. J. Ward, B. F. Raley, Henry Baumgardner, John Boyce, W. H. Babb, Twig Teel, and J. H. Leasure. There is some positive testimony that no water was conveyed through any of these ditches, including the Lowe Ditch, prior to 1890.

Mr. Koontz testifies that he assisted in the construction of the Meadows Ditch, and that there was then no water running in the Lowe Ditch, and but slight traces left of the ditch itself. There is other evidence of like import. Upon the other hand, however, there has been such an array of witnesses asserting to the contrary that it must be conceded as a fact that the Lowe Ditch, or such as the farmers enlarged and extended, carried water long prior to 1890. M. C. Tribble testifies that water has been flowing through a ditch within a quarter of a mile of his house since he began living there in 1877; that the ditch led to what is known as ''Teel's Lower Place,'' and through Baumgardner's place down the other way, and came from the mouth of Alkali Canyon, practically where the Allen Ditch Co. takes its water; that the ditch referred to has been known as the ''Lowe Ditch;'' that Dr. Teel cleaned it out at that time, and has been using water therefrom more or less ever since; that after the Lowes left, witness, Teel, Templeton, and others, and the neighbors generally, worked on the ditch, and that about the same volume of water has been flowing through it from that time to this; that witness is one of the original incorporators of the Allen Ditch Co., and that the persons composing it were Teel, Allen, Koontz, Mrs. Elvira Teel, and himself; that the farmers claim the water distributed through the ditch, and that the original appropriators have never sold to the company. O. Teel testifies that prior to 1877 water was conveyed by a ditch through lands at present owned by his mother, Tribble, and Allen, and onto his father's place, being

the southwest ¼ section of section 7, situate three miles and a half from its source; that part of it ran through the locality of Fred Andrews' place; that Jonathan Raley and other neighbors assisted in building the ditch; that the water was supplied from the slough, which was fed from the river, and that he has been using it on the place where he lives, near the head of the ditch, continuously since 1887 or 1888 for irrigation and stock purposes; that the water was formerly used on section 7 for irrigation, but within the last year has been used only for stock purposes; and the capacity of the ditch is now somewhat greater than it was in 1890.   M. T. Allen testifies that water has been flowing to his place through the ditch since 1889, and that he has used it for his stock and irrigation.   William Coffman says that water was flowing through the ditch in 1886; that there was a prong to it, and that part of the water ran through Tribble's place and part in a westerly direction. Henry Baumgardner states that he knew of the Lowe Ditch, and that water came down in it prior to 1890, that Allen was taking water out of it down through his place in 1889; and that witness irrigated an orchard and used water from it for stock purposes.   Asa Thompson testifies that he has known of water running through the ditch off and on all the time since 1883, but could not say whether it continued during the dry season.   B. F. Raley says that when the Lowes left the ditch partly finished others took hold of it, and extended it further down, and took out the water; that witness, his father, and Teel and his boys worked on it in 1868 and 1869, and that the water has continued to flow through it and over the lands most of the time.   John Boyce testifies that he left Teel's place in 1877, and that water was running in the ditch at the time, and has continued ever since; W. H. Babb, that he has been running it down to his place continuously since 1889; and J. H. Bobbins, Twig Teel, J. B. Stanley, Levi Gill, and T. C. Smith, that water was running through the ditch prior to 1890; so that, to our minds, it is clearly established that the ditch, as now used by the Allen Ditch Co., was utilized prior to that date for the distribution of water among the farmers inter-

ested therein. This establishes the diversion more than ten years prior to the institution of this suit.

Now, as to the use. Prior to 1890 it is probable that there was but little of the water used for irrigation in the ordinary way. There was some subirrigation, and much of it utilized for stock and domestic purposes. M. C. Tribble began the use to some extent prior to that time, even as far back as 1877, and has since reduced to cultivation from 80 to 90 acres of his land, and irrigates the same, together with an orchard and shrubbery. O. Teel began the use at the upper Teel place in 1887 or 1888, and now irrigates from 170 to 180 acres; and at another place he utilizes the water for stock purposes, and until recently for irrigation. M. T. Allen uses it for irrigating 30 acres of alfalfa, besides other ground for grain, orchard, and shrubbery. Fred Anderson uses it on 50 acres or more; T. C. Smith on 40 to 50 acres; Dr. C. J. Smith on 60 to 70 acres; and others might be mentioned, but, suffice it to say, the evidence shows that the water is now employed for irrigating 600 acres or more, besides orchards and shrubbery, and for stock and domestic purposes. Out of the 600 acres, the use for 120 or thereabouts is paid for at the rate of $1.50 per acre by individuals who were not concerned in the construction of the ditch and the diversion, or have not succeeded to the rights of those who were. Of course, some of the persons instrumental in making the diversion have since parted with their lands, but the use of the water has continued appurtenant thereto, and the present owners have thereby acquired the rights of their predecessors.

1. All the original owners concur in their testimony that in the formation of the Allen Ditch Co. none of them surrendered their water rights previously acquired to the company, and that it was organized merely to facilitate the distribution of the water among those entitled thereto; that they have been selling the use of some water when not employed by those entitled to it, and that the recompense has been expended in keeping the ditch in repair, and not as a matter of profit to the concern. These conditions show such a privity between the

Allen Ditch Co. and the farmers, or original claimants, as to enable the former to maintain its defense in their behalf. That the water has been of great utility to the territory in proximity to the ditch is unquestioned. Houses and barns have been constructed, and many acres of land reduced from its wild and arid condition to a high state of cultivation. Orchards, shubbery, and ornamental trees have been planted, and the community is described as thriving and prosperous. The use of the water is absolutely essential to the maintenance of the present condition. But, notwithstanding all this, if the plaintiff has a better right, under the law, to have it flow down the channel of the river, through and beyond its lands, by reason of its riparian ownership, than the farmers have to use it by virtue of a prescriptive right, the injunction should be maintained; otherwise not.

2. The plaintiff's riparian right to have the water flow in the stream undiminished in quantity, except by the reasonable use thereof by riparian proprietors, is appurtenant to the land, running with it as a corporeal hereditament. Adverse possession to realty may have its inception in trespass, and naked possession under a claim of right actual, hostile, open and notorious, exclusive, and continuous for a period of ten years, will, in this state, ripen into a perfect title: 1 Am. & Eng. Ency. Law (2 ed.), 795; *Joy* v. *Stump*, 14 Or. 361 (12 Pac. 929); *Altschul* v. *O'Neill*, 35 Or. 202 (58 Pac. 95). If the riparian owner grants a right to divert the water and convey it away to and upon the lands of the grantee, the grant becomes an easement appurtenant to such lands, which becomes thereby the dominant estate, and the grant an incorporeal hereditament. If title be acquired by prescription, the estate and the right are the same. So that we are confronted with the anomalous proposition that plaintiff has lost a corporeal hereditament appurtenant to its land by reason of the operation of the statute of limitations, and the defendant has acquired an easement or corporeal hereditament appurtenant to its lands by virtue of the same statute; in other words, that the statute has operated to convert a corporeal hereditament into

an incorporeal hereditament, and at the same time to devest plaintiff of the one and invest defendant with the other. Says Mr. Justice CURREY, in *American Co.* v. *Bradford,* 27 Cal. 360, 366: "The general and established doctrine is that an exclusive and uninterrupted enjoyment of water in a particular way for a period corresponding to the time limited by the statute within which an action must be commenced for the recovery of property or of the assumed right held and enjoyed adversely becomes an adverse enjoyment sufficient to raise a presumption of title as against a right in any other person which might have been but was not asserted." The term "prescription," strictly speaking, is applicable only to incorporeal hereditaments, and not to land. Anciently, in order to support a title by prescription, the use of the incorporeal right must have continued immemorially; that is, have had a commencement before the reign of Richard I., but latterly it came to be held that a continuous use in a particular manner for twenty years corresponding to the period usually prescribed by statutes of limitations for entry upon lands was sufficient for the purpose: Gould, Waters (3 ed.), § 329. In analogy to this principle, the acquirement of a prescriptive right has come to be measured by the statute of limitations for the recovery of real property, and such is the rule in this state: Kinney, Irr. § 295; *Dodge* v. *Marden,* 7 Or. 456.

3. Plaintiff's riparian rights have been invaded by the diversion. This suit is based upon that idea, and there can be no further controversy relative thereto. But the point of time when the invasion commenced so as to set the statute of limitations running is yet a matter of inquiry. To render the enjoyment of any easement exclusive evidence of right, it must have been continued, uninterrupted, or pacific and adverse; that is, under a claim of right, with the implied acquiescence of the owner: 3 Kent, Comm. p. 434. It is said that the rules of law governing the acquisition of a right by prescription in a case where it is to run against the rights of a riparian owner are similar to those governing where the prescription is to run against a prior appropriator: Kinney, Irr. § 295. In *Huston*

v. *Bybee,* 17 Or. 140 (20 Pac. 51, 2 L. R. A. 568), Mr. Justice
THAYER says: "The proof must establish an exclusive use of
the water under a claim to so use it;" and Mr. Justice Fox, in
*Alta L. & Water Co.* v. *Hancock,* 85 Cal. 219,  223 (24 Pac.
645, 20 Am. St. Rep. 217), says: "Actual and uninterrupted
user, however, with or without the statutory appropriation, if
adverse, for a useful purpose, and under a claim of right, con-
tinued for the period prescribed by the statute of limitations,
gives a prescriptive right which will extinguish the rights of
a riparian appropriator.   Statutory appropriation, therefore,
is not necessary to prescription, but it gives to one who seeks
to acquire right by prescription this advantage: that it gives
the prior claimant notice that his user is adverse, and under
claim of right, and sets the statute in motion against such prior
claimant."   So the court say in *Smith* v. *North Canyon Water
Co.* 16 Utah, 194 (52 Pac. 283, 286): "The right of the de-
fendant in the water would become fixed only after seven
years' continuous, uninterrupted, hostile, notorious, adverse
enjoyment; and, to have been adverse, it must have been as-
serted under the claim of title, with the knowledge and acqui-
escence of the person having the prior right, and must have
been uninterrupted. * * The possession must have been actual
occupation, open, notorious, hostile, and under a claim of title
exclusive of any other right."   This principle has been re-
affirmed by the same court in *Centre Creek W. & Irrig. Co.* v.
*Lindsay,* 21 Utah, 192 (60 Pac. 559), the language there em-
ployed being that "the possession must have been actual occu-
pation and use."   The adverse holding of land and of an ease-
ment constituting the use of water are exactly parallel, so far
as the similarity of the property will admit of it.   As to land
there must be actual occupancy, but the condition may be ful-
filled either by *pedis possessio* or constructively, if the holding
is under color of title.   Literally, there can be no occupancy
of water.   There may be a use of it; and some of the authori-
ties above cited seem to indicate that, to be adverse, the use
must be actual, which would seem to imply that all the water
must have been put to a beneficial use by the claimant from

the inception of the adverse right. The manner of making a prior appropriation in this state is now well understood. Three elements must exist,—an intent to apply the same to some beneficial use, diversion, and an actual application within a reasonable time to some useful industry: *Low* v. *Rizor*, 25 Or. 551 (37 Pac. 82). If the appropriation is initiated by notice, and there is a diversion within a reasonable time, and application to a beneficial use made within a reasonable time after the diversion, it will be deemed to have been made as of the date of the notice given; but, if there is no notice, it will be deemed to have been made as of the date of the diversion: *Nevada Ditch Co.* v. *Bennett*, 30 Or. 59 (45 Pac. 472, 60 Am. St. Rep. 777). In such a case there is only constructive use of the water until actually applied, which completes the appropriation. It was said in the case last cited that "all rights acquired prior to this time, at whatsoever step in the process, amount simply to a claim of an appropriation; but they are none the less rights and privileges which may be asserted and maintained against all persons not entitled to priority in rights and privileges of like nature."

4. Now, if actual diversion, followed within a reasonable time by application and actual use, is sufficient for the inception of a valid prior appropriation, why is it not sufficient to set in motion the statute of limitations? The rights of the prior appropriator or riparian owner have been invaded, and he has been deprived of the use of the water, for which he has an action against the trespasser, and the possession passes absolutely under the control of the one making the diversion. There is a claim of right arising from the attempt to make the appropriation, so that this essential to adverse possession is subserved. The other essentials—that it must be open, notorious, exclusive, and continuous—are not incompatible with this kind of possession; so that all the elements of the statute to make it effective are complied with, unless it be that the use must be actual in the exact literal sense of that term. But we do not think that such is the requirement of the law. If there is a diversion, followed by actual and exclusive possession and

control, such as will constitute an invasion of prior acquired rights, with the intent and purpose of applying the water to some need or useful purpose, and there is actual application within a reasonable time, such as will serve to complete a valid prior appropriation, there is such a user as will set the statute of limitations in motion, and, if continued for the statutory period, will confer a valid title to the easement. This is in harmony with the method for the acquirement of water rights by prior appropriation, and is a logical deduction from the principles by which they are sustained and upheld, and would seem to be reasonable and just.

In this view the farmers whom the defendant represents are entitled to so much of the water as they are now employing for a useful purpose. Most of it was so employed early in the last decade, and has been continuous to the present time. Several witnesses state that about the same quantity of water flowed in the old Lowe Ditch as is now being carried by the Allen Ditch, and some are of the opinion that the latter carries more by a fourth. All of that which is carried seems to be used, but a portion is being sold to outside parties, as we have seen. The defendant claims 2,400 inches, but the evidence adduced does not establish its title to this amount. One or two witnesses testify that the ditch, a short distance below the head gate, carries to the depth of two feet, being eight feet or more in width. Mr. Kimbrell, one of the plaintiff's witnesses, a surveyor and civil engineer, says he measured the water at the head gate, and that it was one foot deep by seven and a half feet in width. The measurement was taken eight feet below the head gate. But he further states that the water was nearly two feet in depth above the head gate, and that there must have been one foot pressure. This is the most definite statement that we find in the record as to the amount of water being diverted. An orifice seven and a half feet by one foot with a 6-inch pressure will probably pass down to the defendant about the amount of the original diversion, thus giving it 1,080 miners' inches, as understood by many persons of practical experience, and not more than that, to which it is entitled.

5. Another question is pressed, which is that the holding has not been continuous. This is based upon the testimony of Hunt and Hamilton, whereby it appears that in 1885 Hunt made an objection to the defendant taking the water out of the river, addressing it to O. Teel, the secretary of the defendant company. Teel denies that any such objection was made; but, whether there was or not, it was not of such a nature as to break the continuity. The diversion continued, and neither Teel nor the company acceded to the demand, or paid any attention to it, but proceeded with the assertion of their right and the exercise of authority and control over the use of the water diverted. The objection amounted to nothing more than the mere denial of the defendant's right, and this was insufficient. "Mere denials of the right, complaints, remonstrances, or prohibitions of user, unaccompanied by any act which in the law would amount to a disturbance, and be actionable as such, will not prevent the acquisition of a right by prescription: Gould, Waters, § 332; Long, Irr. § 91; *Cox* v. *Clough,* 70 Cal. 345 (11 Pac. 732); *McGeorge* v. *Hoffman,* 133 Pa. 381 (19 Atl. 413).

6. There is evidence tending to show that for a while in 1892 and 1893 some of the interested parties, represented by defendant, used water from the Columbia Valley Ditch, but this was not a recognition by them of any right it had to divert such water. They used it in defiance of the alleged rights of the company, and because it had in the construction of its ditch interfered with the regular flow of the water in their ditch. It may have been that for a while all the water claimed by defendant passed into the big ditch, and flowed therein for a short distance, and was taken up again by the claimants; but these circumstances do not alter the case. There was no recognition by defendant of any rights antagonistic to its claim, or those for whom it is the agent and intermediary, and the controversy was not such as to break the continuity of its holding.

We have not considered the rights of any of the parties whom the defendant represents as riparian owners. Under

the pleadings, as they have come to us, it is doubtful whether
such a question could be properly urged, and the defendant's
rights are dependent entirely upon the statute of limitations;
but, as we have seen, the statute has run in its favor, thus giv-
ing it title by prescription to the amount of water that will
flow through an aperture 7½ feet by 12 inches under a 6-inch
pressure, and the decree of the court will be that defendant
be enjoined from a diversion of any larger amount.     The ap-
pellant is entitled to its costs and disbursements, both in this
and the trial court.                                        MODIFIED.

Decided 3 June; rehearing denied 3 November, 1902.