[No. 10351.    Department Two.    October 7, 1912.]

FRANK D. ALLEN *et al.*, *Appellants*, v. BRITTA ROSEBERG, *Respondent*.[1]

WATERS AND WATER COURSES — IRRIGATION — ADVERSE POSSESSION. Where a dispute arose as to the absolute right to use for irrigation the waters of a creek, and the parties agreed to divided the water half and half, and acted thereon, uninterrupted use of one-half of the water under the agreement for the period of 19 years ripens into title thereto by adverse possession, even as against a prior appropriation; and it is immaterial that such adverse use was by a lower proprietor, the agreement being a distinct recognition of his claim and fixing the extent of it.

Appeal from a judgment of the superior court for Kittitas county, Kauffman, J., entered November 20, 1911, in favor of the defendant, after a trial on the merits before the court, dismissing an action to enjoin interference with the waters of a stream.    Reversed.

*Short & Gleysteen* and *Hovey & Hale*, for appellants.

*Pruyn & Hoeffler*, for respondent.

ELLIS, J.—This action was brought to enjoin the defendants from interfering with the plaintiffs' use of water, from what is called in the record "Dry Creek," in Kittitas county. The defendant Britta Roseberg answered, claiming ownership of the water under an alleged prior appropriation by one Preston, her predecessor in interest. The other defendants disclaimed any interest in the water. The plaintiffs Frankland and wife were tenants of the plaintiffs Allen. A trial was had, and the court entered a decree in favor of the defendant, Britta Roseberg, and dismissing the action. The plaintiffs Allen and wife have appealed.

The material facts developed by the evidence are as follows:    In May, 1880, one Preston settled upon unsurveyed land which, when afterwards surveyed, constituted the north-

[1]Reported in 126 Pac. 900.

west quarter of section 2, township 19, north, range 15, E., W. M.  After the survey, he filed his preemption thereon, made final proof, and received patent therefor.  This and the other lands involved are arid and require irrigation for profitable farming.  He testified that, in June, 1880, he went about a mile from his settlement to a point near the southwest corner of what since the survey constitutes section 3, township 19, north, range 15, E., W. M., and is included in the Northern Pacific Railroad grant; that he diverted a perennial stream flowing across the south part of sections 3 and 2, by digging a ditch in a northerly direction some 300 or 400 yards, thus turning all of the water of the stream into a natural depression running to the northwesterly part of section 2.  He claims to have used practically all of this water during the irrigating season to irrigate his land each year, till 1885.  His enclosure included a few acres of the northeast quarter of section 3, which he also irrigated from this stream.  No other witness testified to this diversion, or ever knew of the stream running anywhere except as at present.  Several witnesses testified that there was no sign of an old bed or other evidence of such change.  At a point a short distance southwest of the southeast corner of section 34, township 20, north, range 15, E., W. M., which is also the northwest corner of section 2 and the northeast corner of section 3 above mentioned, the stream divided into two branches, the northerly branch flowing across the southeast corner of section 34, and the southerly branch in an easterly direction onto the northwest quarter of section 2.

In 1885 Preston sold his land to one Oliver.  In March, 1885, one Taylor filed a preemption claim upon the southeast quarter of section 34, township 20, north, range 15, E., W. M., and obtained a patent therefor in 1891.  He resided on this land continuously from March or April, 1885, till March, 1910, about six months after he had sold it to the appellant Allen in the fall of 1909.  Taylor, in April, 1885, appropriated the water of the north branch of the stream, and

used it to irrigate his land in the southeast quarter of section 34. He testified that he was then assured by Preston, then owner of the northwest quarter of section 2, that he—Preston—made no claim to the water of this north branch. Taylor's brother corroborated him in this. Preston admitted this, but testified that the north branch then carried only the surplus water of the stream at high stages, the south branch carrying practically all of the water at the low stages when it was needed for irrigation. The point at which Taylor diverted the water was at or shortly below the forks of the stream. He used this water without interference from any one, every season for four years. In 1890 John Roseberg, then husband of the respondent, and one Peterson, who were in possession of the northwest quarter of section 2 as tenants of Oliver, Preston's grantee, began interfering with Taylor's use of the water, and in 1891 Roseberg, who then held a contract to purchase the land from Oliver, continued the interference, until a physical encounter took place in which Roseberg used a club and Taylor a revolver, Roseberg receiving a slight wound. The neighbors interceded, and the parties were induced to enter into an agreement through arbitrators, dividing the water of the stream into equal parts at the forks by a measuring box, Taylor taking the water in the north branch and Roseberg that in the south branch. The agreement, which was drawn by one of the neighbors, reads as follows:

"This contract of agreement, made this 29th day of May, 1891, by and between John Roseberg, party of the first part, and Edward J. Taylor, party of the second part, both of Cle Elum, Kittitas Co., State of Washington.

"In section 3, township 19, range 15, east, county of Kittitas, state of Washington, on the stream known as Dry creek, we agree to put in a new head gate in the same place as the old one is now, and to divide the water in the same place, and each party to receive one-half of the water of said Dry creek.

"Description of head gate: A box shall be placed on a level which shall be 12 feet long, 2 feet wide, and one foot

deep, the water is to be divided with a V 6 inches wide, 4 ft. in length, and one foot in height, said V to be placed 8 ft. from the west end of said box. And we do both agree that a ditch shall be dug as follows: Beginning 10 ft. west from the west end of said box, and said ditch to run due south for a distance of about 50 rods, or to the high ground across the swamp, and said ditch shall be 20 inches wide in the bottom, and 30 inches wide on top, and 18 inches deep.

"And the party of the first part and the party of the second part do further agree that each party shall pay one-half of the expense in digging said ditch. And the parties herein mentioned do agree that said ditch shall be complete on or before the first day of May, 1892. And the party of the second part shall dig his ditch in a northerly direction to his place, and said ditch shall be dug as near straight from the head gate as practicable.

"And we further agree that all expense in the keeping in repair of said box at head gate, and on the ditch running south, and also on cleaning out of old channel shall be paid jointly. (Duly witnessed.)                John Roseberg,
                                    "Edward J. Taylor."

John Roseberg never completed his purchase from Oliver, but made a contract to purchase some of the railroad land in the northeast quarter of section 3. He died and his widow, the respondent, made a new contract to purchase the same land, and in February, 1903, the railroad company conveyed the land to her. She has resided there ever since. The evidence shows that she knew of Taylor's use of the water ever since the making of the agreement with her husband, and that the measuring box at the point of division has been renewed, her son helping Taylor in that work. Taylor used his one-half of the water under the agreement continuously, in irrigating his land each season from May, 1891, till 1910, with her knowledge and acquiescence. Respondent also now owns some of the land in section 2 formerly owned by Preston, and has used half of the water in irrigating this and her land in section 3. When the appellants Allen took possession of the Taylor land, the respondent again made a claim to all of the

water, and began using it, and in 1911 the appellants brought this action.

We are of the opinion that, under the evidence, the appellants are entitled to one-half of the water of the stream in question, by reason of the agreement between their grantor and John Roseberg, and his continuous use of the water as appurtenant to their land for a period of nineteen years. It can hardly be questioned that Taylor began using water from this stream in 1885 without any objection from Preston, the only person then adversely interested, and that he continued this use for four years without his right being questioned. When the dispute arose between him and Roseberg, he was claiming, not a mere license, but an absolute right to use the water. The agreement of May 29, 1891, between them shows upon its face that it was intended as a final settlement of this dispute. The respondent did not sign the agreement, but the evidence is conclusive that she must have known of it, and it is undisputed that she acquiesced in its observance from its date until 1910. Whatever might have been the relative rights of the parties prior to this agreement, it certainly formed a sufficient basis for an adverse possession and use by Taylor of half the water after that time. That his use thereafter was adverse, under a claim of right, and not merely permissive, is beyond question. Assuming that Preston had made a prior appropriation of all of the water, Taylor's right to half of it had ripened into a complete title when the appellants purchased from him. Title to water can be obtained by adverse possession for the statutory period, even as against a prior appropriation. 3 Farnham, Waters and Water Rights, § 680; *Farwell v. Brisson*, 66 Wash. 305, 119 Pac. 814; *Oregon Construction Co. v. Allen Ditch Co.*, 41 Ore. 209, 69 Pac. 455, 93 Am. St. 701, and notes.

The respondent contends that there can be no adverse use by a lower proprietor as against those above, since the use below is no interference with, and hence no possible invasion

of, the rights of the upper owner, citing Weil on Water Rights (3d ed.), p. 635, and other authorities. It is no doubt true that a lower use is, as a general rule, in its very nature not adverse. But this rule is applicable in its full sense only as between upper and lower riparian proprietors, and only where the lower use does not interfere with the upper. Such is obviously not the case before us in any view of the facts. If, as respondent claims, her rights date back to Preston's alleged diversion of the stream a mile away from his land, then prior to that diversion the land of neither party was riparian to the stream, and Taylor's use was of water already diverted, and was necessarily an interference with its use by Preston and his grantees. The rival claims were not between upper and lower riparian owners. If, on the other hand, the stream had always been where it was in 1885 (and it must be admitted that the evidence strongly suggests that theory), then both parties were riparian, the one to the north branch and the other to the south, and there was no evidence to show that the diversion of the water by Taylor was not above that by Preston and his successors. Both seem to have taken the water out at or below the forks. In either case it is plain that the use by Taylor was an interference with the use by the respondent's predecessors, and hence was capable of being an adverse use. It was so adverse as to lead to a physical conflict, and was recognized as adverse by the agreement to divide the water by arbitration. The respondent knew of its adverse nature then, and there is nothing in the agreement changing the nature of Taylor's claim. On the contrary, the agreement was a distinct recognition of his claim and fixed its extent. Under the evidence the appellants are entitled to the use of one-half, but only one-half, of the water of the stream without interference.

The judgment is reversed, with direction that the injunction issue accordingly.

MOUNT, C. J., FULLERTON, MORRIS, and GOSE, JJ., concur.