Decided 30 July, rehearing denied 3 September, 1907.

## GARDNER *v.* WRIGHT.

### 91 Pac. 286.

ADVERSE POSSESSION—EFFECT OF SUBSEQUENT ACQUISITION OF TITLE TO PROPERTY BY GRANTOR.

1. Subsequent possession by the grantor of land under claim of ownership, etc., for the period prescribed by the statute of limitations, will not necessarily inure to the grantee's benefit, and title by adverse possession may be acquired by the grantor under such circumstances; but, if possession is held in subserviency to the grantee's title, it will inure to his benefit.

ESTOPPEL BY DEED—PERSONS WHO MAY CLAIM BENEFIT—PAROL TRANSFEREE—WATERS.

2. E. conveyed to M. and G. possessory title to public land, including the right to the full use of a stream, and G. orally transferred his interest to M. *Held,* that no diversion of water having been made prior to G.'s parol conveyance, nor until after a diversion by E. on land above, defendant, as E.'s successor in interest, was not estopped to claim subsequent rights acquired by E. as to G.'s interest in the water rights previously conveyed.

ESTOPPEL BY DEED—DENIAL OF TITLE BY GRANTOR.

3. Where one assumes to convey property by deed, he will not be heard, in order to defeat his grantee's title, to say that at the time of the conveyance he had no title, and that none passed by the deed, nor will he be permitted to deny to the deed its full effect.

ADVERSE POSSESSION—EFFECT OF SUBSEQUENT POSSESSION BY GRANTOR.

4. One relying upon adverse possession as against the grantee of his predecessor must show that there was a change in the relation of the parties respecting the rights involved, any unexplained possession being presumed to be subservient to the title conveyed; and, in order to avail himself of the laches of the grantee or his assigns or of the statute of limitations, the grantor must show that actual or constructive knowledge of the change in the relations was brought home to the grantee or his successors in interest.

WATERS—EVIDENCE OF SUBSEQUENT ADVERSE USER BY GRANTOR—DISCLAIMER.

5. A showing that after a land owner had deeded his farm with the full use of a stream flowing through it, he openly used part of the water from that stream on land that he afterward acquired further up, under posted and recorded notices, with the general knowledge of the community, establishes a disclaimer against the deed, and is sufficient to charge the owners of the deeded land with notice that he did not intend to be bound by the covenants therein, though, of itself, such showing does not establish adverse user.

WATERS—ADVERSE USER—WHEN STATUTE OF LIMITATIONS BEGINS.

6. The statute of limitations begins to run in favor of an adverse claim to the waters of a stream when the conduct of the adverse claimant indicates an intention to claim and hold the water against all other persons, and such conduct is supported by an actual diversion for a beneficial purpose of sufficient proportions to show good faith.

49 OR.——39

WATERS—EFFECT OF RUNNING OF STATUTE ON ADVERSE CLAIMANT.

7. Where one permits ten years to elapse without regaining control over water to which another has exercised an· adverse claim subsequent in date, unless such use was permissive or of such a character as not to constitute an invasion of the rights of the first claimant, the adverse claim becomes a complete title, the rule being the same with reference to both land and water.

ADVERSE POSSESSION—MATERIALITY OF CLAIMANT'S GOOD FAITH.

8. Title by adverse possession may be acquired, regardless of the claimant's good faith, if accompanied by a claim of title.

ADVERSE POSSESSION—ORAL EVIDENCE TO EXPLAIN AND LIMIT MEANING OF DEED IN CHAIN OF TITLE.

9. Parol evidence is admissible by a grantor of the right to the full and free use of the waters of a stream appurtenant to certain land to show that such grant meant only the surplus water not used on another 'tract owned by the' grantor further up the stream.

WATERS—INTERRUPTION OF ADVERSE POSSESSION.

10. Adverse use of the waters of a stream, as a defense to a suit to determine rights thereto, may be defeated by showing that the use during the irrigation seasons for the statutory time .was not continuous or by proof that such use did not substantially interfere with plaintiff's rights.

WATERS—BURDEN OF PROOF AS TO ADVERSE POSSESSION.

11. Though an adverse right cannot grow out of mere· permissive enjoyment, the burden of proving possession·thus claimed to have been ·held by permission or subserviency, or not to have .been continuous, is upon him who attempts to defeat the claim.

WATERS—ACTS CONSTITUTING ·ADVERSE POSSESSION.

12. Where a claimant of water has for the period of .limitations re-·quired all the water of a certain stream to supply his needs, the use for .that period of a considerable portion of such water by an·adverse claimant has constituted an·invasion of the .rights of. the original claimant for that 'period and establishes a *prima facie* case of. adverse possession.

NATURE OF TITLE ACQUIRED BY ADVERSE POSSESSION.

13. When title has once been acquired by adverse possession, it remains in the person acquiring it as completely as if acquired by deed, and hence interruptions ·of such possession ·are of no avail unless they have been open, exclusive, continuous and adverse under· a claim of ownership ·for the statutory period.

WATERS—USE DURING DIFFERENT PARTS ' OF THE YEAR. '

14. 'One may' establish a right to the' use of water from a stream during one part of a year, while another person may at the same time acquire a right to ·use the water from the same stream for the' remainder of the year.

WATERS—INTERRUPTION OF ADVERSE USE BY THIRD PARTIES.

15. Claims of adverse possession or use must be determined by the acts of parties to the litigation and their grantors, and interruptions by others cannot be considered.

NATURE 'OF POSSESSION TO CONSTITUTE ADVERSE POSSESSION.

16. The possession required by Section' 4, B. & C. Comp., providing that no action can be maintained for the recovery of real property or its possession unless 'the plaintiff or his predecessor was possessed of the

premises in question within ten years before the commencement of the
suit or action, means an actual, substantial and practically permanent
occupation, and unless such possession is shown a claimant cannot pre-
vail. An irregular, occasional, interrupted possession will not fulfill the
requirement of the statute.

BURDEN OF PROOF UNDER CLAIM OF PRIOR APPROPRIATION.
17. Under the general rule that the pleader has the burden of proof
as to his affirmative allegations, it is incumbent upon one who asserts the
title to certain water by prior appropriation to satisfactorily prove his
claim.

ESTOPPEL—EQUITABLE—NATURE.
18. The doctrine of estoppel is intended to preclude fraud, and imposes
silence on one, when in conscience and honesty he should not be allowed
to speak, to the accomplishment of justice.

WATERS—NEGLECT TO USE IS ABANDONMENT.
19. A delay of several years in using waters under an initiated but
inchoate right amounts to an abandonment.

WATERS—ESTOPPEL BY DEED AGAINST AFTER-ACQUIRED TITLE.
20. An after-acquired title to water rights by the grantor will not
inure to the benefit of the grantee, where the grantee knew at the time
of the transfer that the grantor had no title and did not expect him to
procure one, or where the title purported to be conveyed was an inchoate
interest, the completion or forfeiture of which depended upon some acts
to be performed, or diligence to be exercised by the grantee, and the
grantor has forfeited his inchoate right by neglect.

IRRIGATION REQUIREMENT PER ACRE.
21. In testifying as to the amount of water required to properly irri-
gate a given tract of land it is desirable to have in the record the facts
on which witnesses base their estimates; but in this case the court will
adopt the opinion that an inch an acre is sufficient for both domestic and
irrigation purposes.

MEASUREMENT OF WATER—"SECOND FEET"—"MINER'S INCHES."
22. The term "miner's inch" is so indefinite and inexact that it is
not satisfactory as a standard for measuring water, and this court pre-
fers "second feet," or the quantity of water flowing past a given point
in a given space of time under a six-inch pressure.

WATERS—RIGHT OF SUBSEQUENT CLAIMANTS TO USE WATER NOT IN
ACTUAL USE BY PRIOR CLAIMANTS.
23. In a case where several appropriators have a right to use the
waters of a stream, water not in use for actual requirements should not
be diverted or detained, but it should be allowed to pass to the use of
the others, all being limited to their actual needs to the extent of their
respective appropriations. Appropriators cannot either permanently or
temporarily divert water without using it as against the needs of sub-
sequent appropriators.

APPEAL—REVIEW—DISCRETION AS TO COSTS.
24. The trial court having discretionary powers in taxing costs, a
decree in respect thereto will not be disturbed unless the discretion is
abused.

Statement by MR. COMMISSIONER KING.

This is a suit to determine the right to the use of the waters of Washington Creek, in Baker County, Oregon, brought by Mary S. Gardner, Edna V. Stuchell, A. V. Swift, A. B. Swift, and L. L. Swift, against George F. Wright. By stipulation it is agreed that A. V. Swift has succeeded to all the interests of the other Swifts named, and that he, with Mary S. Gardner and Edna V. Stuchell, are the sole plaintiffs in interest.

The complaint, in effect, alleges that plaintiffs, under and by virtue of prior appropriation of the waters of Washington Creek, as well as by reason of a certain deed executed to their predecessors in interest, are the owners jointly of the right to the use of three-fourths of the waters of the creek named, of which it is alleged that Mary S. Gardner and Edna V. Stuchell are the owners of one-fourth, and A. V. Swift one-half. Defendant denies plaintiffs' right to the use of any of the waters of Washington Creek, except the surplus, and alleges that he is the owner of the exclusive right to the entire stream for the irrigation of his lands, all of which it is claimed is necessary for the proper irrigation thereof, and has been used continuously for such purpose during the last 40 years, with the full knowledge and consent of plaintiffs and their grantors. Defendant alleged, in support of his title, prior appropriation, riparian ownership, and adverse possession since 1863; but the averment relative to riparian ownership was stricken out on motion of plaintiffs.

The reply denies the affirmative allegations, and, in response to the defenses relied on, pleads an estoppel against defendant by reason of a certain deed with covenants of warranty therein given by H. W. Estes (defendant's grantor) and Frederick Dill to their predecessors in interest, which, omitting the signatures and acknowledgment, is as follows:

"This Indenture made this 9th day of September, A. D. 1864, between Harding W. Estes and Frederick Dill of the County of Baker and State of Oregon, parties of the first part, and Oscar L. Gordon and George W. Manville of the same place, parties of the second part, Witnesseth:

That the Said Parties of the First Part for and in consideration of the sum of one thousand dollars to the parties of the first part in hand paid by the parties of the second part, the receipt whereof is hereby acknowledged, have granted, bargained, sold, conveyed and quitclaimed and by these presents do grant, bargain, sell, convey and forever quitclaim unto the said parties of the second part their heirs and assigns forever, all the right, title, interest and claim of the said parties of the first part in and to a certain ranch or possessory claim to agricultural lands and the improvements thereon lying and being in said county and state and described as follows, to-wit: That certain ranch or land claim on Washington Creek in Powder River Valley below and adjoining Gray's ranch which has been improved by the parties of the first part and upon which they have resided from the month of June, A. D. 1863, to the past summer, and bounded as follows, to-wit: Commencing at a stake about three rods south of said creek and about thirty rods in a southwesterly direction from the log house built by said parties of the first part and occupied by them as a residence; thence east along a fence one hundred and sixty rods; thence north along a fence one hundred and sixty rods; thence west along a fence one hundred and sixty rods; thence south along a fence one hundred and sixty rods to the place of beginning; together with the right to the full and free use of the water of said Washington Gulch and all privileges connected with the same, the said water having been taken up and appropriated by the parties of the first part, for the use and benefit of said ranch in the month of June, A. D. 1862, at the time said ranch was located and claimed.

To Have and to Hold the said premises, together with all and singular the rights, privileges, tenements, appurtenances and improvements thereunto belonging or in any manner appertaining.

And the Said Parties of the First Part hereby covenant with and to the parties of the second part, their heirs and assigns, that they are the lawful possessors of said land or ranch and the sole owners of the improvements thereon and of the water right above mentioned, and that they have a full and perfect right to sell and dispose of the same, and that the title to the same they will forever warrant and defend against all persons whomsoever claiming by, through, or under them, or either of them.

In Witness Whereof the said parties of the first part have hereunto set their hands and seals this the day and year first above written."

By stipulation it was admitted that A. V. Swift is the owner in fee of the S. E. ¼ of section 2; that Mary S. Gardner and Edna V. Stuchell have succeeded to the interest of J. B. Gardner, deceased, in and to the N. E. ¼ of section 11; and that George F. Wright is the owner in fee by purchase from H. W. Estes of the lands described in the answer, viz.: W. ½ of S. W. ¼ section 11; E. ½ of S. E. ¼, section 10; N. E. ¼ of N. E. ¼, section 15—all the lands so described being in township 9 S., range 39 E., W. M.

Washington Creek is a natural stream fed by springs and snow in the mountains west of Baker City, and flows in a northeasterly direction through Washington Gulch across defendant's premises and through Gardner and Stuchell's lands onto the Swift farm, where it spreads out and disappears. It varies in quantity from a flow of 10 miner's inches in the low-water season to 150 inches during the early spring freshets. In 1862 Estes and Dill settled upon what is now defendant's farm, and in the following spring took possession of some lands lower down the stream, now constituting the farm of A. V. Swift; the latter farm being the premises referred to in the deed to Gordon and Manville. The first place named is known as the "Estes Farm," and the second as the "Swift Ranch." In the spring of 1863 a ditch was constructed by Estes and Dill tapping Washington Creek, through which water was conveyed onto the Estes place for the purpose of irrigation, and on April 25th of the following spring they located a water right for the lower Swift farm by posting a notice thereof on the channels of the stream, which was on that date recorded with the county clerk of that county, as follows:

"WASHINGTON GULCH.

Know All Men that the undersigned hereby claims all the water of Washington Gulch for the purpose of using the same on his land claim in Powder River Valley. Said ranch joins Gray's ranch on the east. And the water hereby claimed is the natural water of said gulch that flows in its natural channel through said land claim, which is thus claimed for the purpose of preventing the same from being abstracted in its flow at any point above said claim. Frederick Dill."

In February, 1864, the Estes Farm was sold to Abner Smith, who resided there until his death, which occurred in the fall of 1865. His family continued to live there, and in 1867 his widow married Estes, one of the former owners of the farm. At that time all the land on Washington Creek was unsurveyed public land of the United States. In 1869 Estes filed a homestead on the land, to which the right of possession had been sold to Smith, as stated, and about two years later made final proof thereon, receiving his patent in 1878. After his marriage, Estes continued the cultivation of the crops, which he irrigated with water diverted from Washington Creek through the ditches previously constructed for that purpose; and, in order to publicly announce and record his claim thereto posted a notice at the head of the ditch constructed in 1863, which he caused to be recorded in the county clerk's office, as follows:

### "WASHINGTON CREEK.

Notice is Hereby Given that I, Hardin W. Estes, hereby claim 75 inches of the waters of Washington Creek for mining, mechanical and irrigating purposes, the same having been heretofore taken, appropriated and diverted from said stream by a certain ditch constructed by the undersigned in 1863, tapping said creek at a point about a quarter of a mile above what is known as the 'Washington Ranch' in Baker County, Oregon, and claimed and used by the undersigned since said date.

Dated and signed at Washington Ranch, Baker County, Oregon, March 19, 1872.                     Hardin W. Estes."

On the same date, and recorded at the same time, another notice of like import was posted farther down the creek by him on his land, claiming an additional 75 inches of water through a ditch tapping the creek on his premises "at a point opposite what is known as Washington Ranch house," alleging diversion from that point through a ditch constructed in June, 1866.

In support of their claims, plaintiffs, at the trial, introduced deeds showing the record evidence of title to their respective interests from the date of the first written instrument executed by Estes and Dill to plaintiffs' predecessors in interest. Witnesses were then called, who testified to the use of the water of

the stream for irrigation of plaintiffs' lands in the production of hay, grain, vegetables and some orchard at various times since the year 1884, but not prior to that time, except that M. J. Hindman referred to some irrigation on the Swift place in 1867, but did not state to what extent and for what purpose used, but that hay and grain were raised on the premises during that year. With this exception, no evidence was offered tending to show an appropriation prior to 1884, except in so far as an appropriation might be inferred from wild hay raised on the land, the moisture for which was produced by the waters of Washington Creek spreading over and sinking into the ground, and from springs rising below defendant's farm.

W. C. Hindman testified that he has resided in the vicinity of the property and been familiar with it since 1863; that in the fall of 1863 he bought hay on the Swift farm from Estes and Dill; that hay and grain lands in that vicinity are usually irrigated until some time in July of each year, and lands along Washington Creek require about one inch per acre for their proper irrigation; that on the place now owned by Swift the land is naturally damp. When asked whether three-fourths of the water from Washington Creek would properly irrigate plaintiffs' lands, he answered:

"There might be enough in a season where there was a flow of water, but in a dry season there would be a scarcity.  *  *  I don't think that it would be (sufficient) at present. It might at one time. There was several years there that the miners threw down sometimes 1,000 inches, from 500 to 1,000 inches, and it has carried an immense deposit of debris onto his ranches, and since that it has taken more water than it formerly did."

Mary S. Gardner testified that she was the wife of J. B. Gardner, deceased, and the mother of Mrs. Stuchell, one of the plaintiffs; that in 1897 she had a conversation with H. W. Estes, in which he admitted both had rights in the waters of Washington Creek; that Estes said his right was given him by the court in his suit with Sparks, the amount of which was 75 inches. J. P. Kennison testified that he has lived in Baker County since 1862, and has been familiar with the Washington

Gulch at all times since; that he cut wild hay on the Swift place in August, 1863, but there were no ditches there at that time; that the water spread out over the ground when it reached the place, covering about 80 acres, which condition does not exist on the Estes place and could not without dams to divert the flow from the channel. C. M. Foster deposed that he has known the farms on Washington Creek since 1862, seeing them at various times every year since; that on request of Estes he surveyed the ditch on the south side of the creek on the Estes place many years ago; that the ditch would probably carry 75 inches of water; that he also saw a ditch on that farm in 1863 or 1864, which would carry from 30 to 50 inches of water, then used there for irrigation purposes; that the altitude of the Estes ranch is about 100 feet higher than that of the Swift farm, and was one of the first settled in Baker County, and since in the early sixties has been irrigated and used for raising hay and all kinds of fruits and vegetables; that the orchard covers from 15 to 20 acres, and has been there so long he cannot tell when it was first set out; that he bought hay on the Swift ranch in 1865; that the creek flows down onto the Swift place and spreads out over 50 to 70 acres, where the creek and channel disappears. H. Kennison testified to having known the premises since 1863, and substantially corroborates the statements of the two witnesses last quoted.

David Littlefield testified to having mined and known the farms in that locality since 1862; that he noticed the Estes farm being cultivated during each season at all times since 1863, during which year the road passed in front of the house and crossed the ditch going west, which ditch has been used ever since for irrigating the garden, orchard and ranch generally; that the orchard was small at first and increased in size from year to year, and has been there over 30 years; that he first saw the ditch on the J. B. Gardner ranch in 1875, which place was then occupied and owned by Mrs. Irland, who, at that time, wanted to sell the farm to him, stating she owned one-fourth of the water coming down the gulch, but that the neighbors were taking it away, and said:

"We have no claim on Mr. Estes' water, but we have all the water below that Mr. Estes don't use."

Witness also stated that he never saw any ditches of any kind on the Swift place prior to 1875 or 1876.

H. W. Estes testified to having been in partnership with Dill in the lands owned by the parties to the suit, to having located the water rights and selling the lands, etc., as hereinbefore given, and substantially corroborated the statements of Kennison Foster and Littlefield; that at all times since 1863, vegetables, fruit, hay and grain have been raised on the Estes place, and all the waters of Washington Gulch were used in the irrigation thereof, whenever needed, and without interruption; that sometimes he turned the water down to those below when he could spare it for their accommodation; that the water right considered sold and intended to be conveyed by the deed to Gordon and Manville was for water which flowed down to the Swift place after being used on the Estes place, and he never recognized any other right; that after the first few years he took all the water of the gulch to irrigate the lands in cultivation; that he lived on the place until about 1894, when he rented it and moved to Baker City; that all the water ever used at any time on the farms below him was the surplus passing his farm; that the creek furnishes from 100 to 130 inches in the early spring, and falls as low as 15 inches in the fall; that the irrigation season on defendant's place has been from May to November of each year; that the orchard was set out in 1868, and increased from year to year, having been of its present size for about 12 years, and must be irrigated through August, September and October of each year, but hay and grain in that vicinity do not need irrigation after July; that the lands cultivated on the defendant's farm are from 60 to 70 acres; that he filed on the Estes place as a homestead in 1869, and made his final proof in 1871; that, after his marriage to Mrs. Smith in 1867, he always claimed the waters of Washington gulch; that he was never interrupted in the use of the water but once, and that was by Mrs. Swift about the year 1893; that he never had any trouble with any one below, and no one ever tore out any of his dams at

any time. The statements of this witness as to the date of commencement, time, manner, and purpose of use is corroborated by Mrs. Estes. She also adds that her first husband, Abner Smith, purchased the water right to the Estes place from Estes and Dill; that she married Estes in 1867; that a large crop has always been raised on the farm, and, so far as she knew, the use of the water by Estes had not been interrupted at any time prior to the date of his conveyance to defendant.

W. H. Kennedy testified to having resided on the J. B. Gardner ranch 13 years. That during that time he has irrigated all the land on the place for which he could get water, being about 90 acres, consisting of pasture, 10 acres; hay, 30 acres; grain, 50 acres. That with water the farm is worth about $4,000, but of little value without it; that he farmed the Swift place from 1886 to 1888; that with water it is worth about $5,000, but without water, about half that value; that while there he occasionally tore out both Estes' dams; that during most of the time he has been on the Gardner place he has done without water on account of persons using it on the Estes place, and "once in a great while" he would go up and tear the dams out, sometimes once, and sometimes twice a week, but never said anything to either Estes or Wright about it, and when the water was obtained as indicated it would "probably come down one day, and may be not two hours;" that the effect was it came near drying them out altogether; that Washington Creek flows through the Swift place about a quarter of a mile, and then spreads out over the meadow; that the irrigation season begins "as soon as the frost goes out," but for grain they irrigate during June and July; that they quit irrigating about August 1st of each year; that when on the Swift place ('86-'88) there were 66 acres of grain and 70 acres of hay land; that on the Gardner place there were at that time 60 acres of grain land and 25 acres of hay land, and about the same amount now; that the dams were torn out during the months of May and June; that the creek furnishes insufficient water to properly irrigate the Gardner and Swift places; that in April the water is very high, but in May the supply dwindles down to about 25

inches, and in June will average about 20 inches, but in July not more than 12 inches, which continues about the same during the rest of the season; that there are some small springs on both the Gardner and Swift places.

Frank Kennedy testified that in 1904 they had no water for irrigation of the Gardner place, but cut about 15 tons of grain and 80 tons of hay; the hay being raised on land which was usually moist; that the usual hay crop is from 70 to 90 tons; that the water is usually turned on the grain land the last of April, from which the hay land situated below is subirrigated. A. V. Swift testified that he has 120 acres in cultivation; that he irrigates 40 acres of hay land with Washington Creek, and there are 80 acres of hay land on the Swift place, which has been there as long as he can remember, and 100 acres on the J. B. Gardner ranch, requiring irrigation. George F. Wright (defendant) testified that Washington Creek flows in well-defined channels northerly through his land; that immediately below his place the combined springs furnish a supply of about 10 inches of water, which is caught by a ditch running onto what is known as the "Rea Place" (not here involved), and is used to irrigate an orchard on the Gardner place, but at times flows down the creek, and, if unobstructed, would continuously flow to plaintiffs' farms; that the amount of water in the creek at his place in April is sometimes 200 inches, in May will average 75 inches, June 50 inches, July 30 inches, and the rest of the season about 10 inches; that it is absolutely necessary to irrigate his orchard through July, August, September and October, of each year, without which the land is worth not more than $6 per acre, but with the water during those months is worth about $22,000; that the orchard covers about 20 acres and requires all the water in the stream during those months for its irrigation. Fred Intermill testified that while farming the Swift place in 1900 he asked Estes for some water, which was turned down for the irrigation of his garden.

Otto Lambert testified that he lived on the J. B. Gardner ranch from 1884 to 1888, when Mrs. Irland had it, living there one year with his father, and during that time irrigating the

farm with water taken from Washington gulch; that, when there was not sufficient water, witness' father was ordered by the person in charge to go and turn it down, and he would sometimes tear the dam out; that Mr. Estes was around the road near there, and would sometimes ask what they were doing, etc.; that this occurred nearly every season, and on such occasions they would get most of the water; that when they would cut the Estes dams the water would sometimes run a day, and again it would not run that long; that this occurred each year he was there; and that, when they would tear out the dams, they would not speak to Estes about it, but he would go and turn the water back and use it for irrigation. Henry Lambert and a number of other witnesses on behalf of plaintiff testified to like interruptions having occurred at various times from 1884 to the date of the commencement of this suit.

The testimony was taken before the court, resulting in a decree in favor of plaintiffs, by which Mary S. Gardner and Edna Stuchell, jointly, were decreed an eighth interest, and A. V. Swift, one-fourth of the entire stream, and enjoining defendant from interfering with plaintiffs' use to the extent of three-eighths' interest, jointly, in Washington Creek during all seasons of the year. From the decree so entered plaintiffs appealed, and defendant filed a cross-appeal.                MODIFIED.

For appellant and cross-respondent (plaintiff) there was a brief over the name of *Hart & Smith,* with an oral argument by *Mr. Julius Newton Hart.*

For respondent and cross-appellant (defendant) there was a brief and an oral argument by *Mr. Charles Augustus Johns.*

Opinion by MR. COMMISSIONER KING.

It is unnecessary to determine whether the court erred in sustaining plaintiffs' motion to strike out defendant's averment concerning riparian ownership, since the evidence as taken does not indicate an intention to rely upon this defense. Plaintiffs, through their predecessors in interest, claim the entire flow of Washington Creek by prior appropriation, which is asserted through the Estes and Dill deed given to Gordon and Manville

in 1864, wherein the appropriation is expressed as having been first made by these grantors in June, 1862. The defendant, as indicated by the evidence adduced in his behalf, relies on adverse possession through his grantor, Estes, for more than the statutory period, having its inception in an appropriation made in the spring of 1863, which is alleged to be prior in time and superior in right to any valid claim of plaintiffs.

It is urged by defendant, and testified to by Estes, that there was no intention of conveying any water rights by the deed referred to, except a right to the surplus water flowing below defendant's lands; but the covenants in the deed, when construed in connection with the water notice of Dill, then on record, convey and warrant the title to the entire stream, to the extent that it may be applied to a beneficial use on the land to which right of possession was therein conveyed, whether such use should be for irrigation or for other purposes. The showing made to that effect in support of the allegations of the complaint, in the absence of other evidence, establishes, as against defendant, a *prima facie* right to the use of the water in plaintiffs to the extent that they may have succeeded to the interests named in the Estes and Dill deed. To overcome this proof defendant insists that he has established his right to the use of the stream (except as to the surplus water) by adverse possession for more than 40 years.

1. Plaintiffs maintain that defendant, through his grantor, is estopped by the covenants in the deed from asserting this defense. It appears well settled that a subsequent possession by a grantor of premises conveyed, under claim of ownership, etc., for the period prescribed by the statute of limitations, will not necessarily inure to the benefit of his grantee, and title by adverse possession for such period may be acquired by such grantor: 16 Cyc. 697; *Jones* v. *Miller* (C. C.) 3 Fed. 384; *Stearns* v. *Hendersass,* 9 Cush. 497 (57 Am. Dec. 65) ; *Hines* v. *Robinson,* 57 Me. 324 (99 Am. Dec. 772) ; *Sherman* v. *Kane,* 86 N. Y. 57; *Horbach* v. *Boyd,* 64 Neb. 129 (89 N. W. 644). In the case last cited, the Supreme Court of Nebraska on this point say: "It must be evident that, if the grantor subsequently

makes an entry upon the possession of the grantee, there is no presumption that the new possession so acquired is permissive or subordinate to the grantee. This would be more obvious where several years intervene between the grant and the entry. Whatever the rule may be where the possession of the grantor continues after the conveyance, in such a case the new title may be established by proof of open and notorious adverse possession, as in other cases." It must be conceded, however, that, notwithstanding the rule stated, if such possession is held in subserviency to the title of the grantee, the possession thereof would inure to the grantee's benefit.

2. The circuit court held, in effect, that, when Estes reacquired the water rights above the Swift farm, any interest so obtained inured to the successors in interest of Manville by reason of the covenants in the deed given to Manville and Gordon in 1864, and that defendant, through Estes, his grantor, is estopped from asserting his claim to the subsequently acquired water rights to the extent that plaintiffs have succeeded to the interest of Gordon and Manville; but held that, since Gordon made only an oral transfer to Manville of his interest in the possessory title to the property acquired under the Estes deed, upon which water had not been diverted at the time of the conveyance, nor prior to the diversion by Estes, the estoppel could not be invoked as to Gordon's half interest in the property described in the deed. The court accordingly held that defendant, as successor in interest to Estes, was estopped to the extent of only one-half of the water right previously conveyed, and found in favor of plaintiffs for one-half of the rights claimed and demanded by each of them. Since no diversion was made prior to the time of the parol conveyances by Gordon, nor until after the diversion and use subsequently made by Estes, it is clear that the court did not err in this holding in respect to Gordon's interest, although a different rule applies where actual appropriation has been made: *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59 (45 Pac. 472: 60 Am. St. Rep. 777).

3. We are then confronted with the question: Was Estes estopped to assert title adversely as to the remaining interest

claimed by the successors in interest of Manville? The general rule is recognized to be that, when a person assumes to convey property by deed, he will not be heard, for the purpose of defeating the title of the grantee, to say that, at the time of the conveyance, he had no title, and that none passed by the deed. Nor can he deny to the deed its full operation and effect as a conveyance, and such deed conveys all after-acquired titles: 16 Cyc. 686, 689, 701; *Taggart* v. *Risley,* 4 Or. 235; *Wilson* v. *McEwan,* 7 Or. 87; *Raymond* v. *Flavel,* 27 Or. 219 (40 Pac. 158). From the foregoing authorities it is clear, under the *prima facie* showing made by plaintiffs by the deed and Dill notice of location of water right, that defendant, by reason of receiving his title through Estes, would be estopped from asserting that, at the time of the execution of the deed from Gordon and Manville, the grantors had no authority to convey more than the surplus waters of the stream; that, notwithstanding they had previously sold an interest therein to Abner Smith, they were estopped in equity from setting up such sale as against any claims of the grantees, or their assigns. This would preclude defendant, as grantee of Estes, in the absence of other testimony, from asserting any title to the water through any rights that may have been received, if any, through the marriage of Estes to Mrs. Smith.

4. As to whether Estes or his grantee are estopped by the covenants in the deed from claiming title by adverse possession against Manville's grantees, however, another and different question arises. There can be no doubt, under the law, that it is incumbent upon a person relying upon a claim of adverse possession, as against a grantee in a warranty deed, to clearly show that there was a change in the relation of the parties with reference to the rights involved before such right can be maintained. Any unexplained possession, therefore, is presumed to be in subserviency to the title placed on record by the deed, from which it follows that the grantor, in order to avail himself of the laches of the grantee or assigns, or of the limitations prescribed by law, must show that he brought home to the grantee and his assigns knowledge, either actual or constructive, of such change in the

relations of the parties: *Jones* v. *Miller* (C. C.) 3 Fed. 384; *Sellers* v. *Crossan*, 52 Kan. 570 (35 Pac. 205); *Schwallback* v. *Chicago, M. & St. P. Ry. Co.* 69 Wis. 292 (34 N. W. 128: 2 Am. St. Rep. 740).

5. It is incumbent, therefore, upon defendant to show to the satisfaction of the court that his possession was not in subserviency to the grantee. The authorities are practically unanimous in support of this view, which appears to be the strong contention of plaintiffs' counsel. We will then examine into the status of the case before us on this point. An examination of the testimony discloses no question as to the character of the holding, not only as to the possession of the defendant, but of his predecessor in interest, Estes. We find that Estes and Dill conveyed all the water, so far as the language of the deed is concerned, to plaintiffs' predecessors in interest, and that possession was surrendered to them under the deed, although, prior to such conveyance, they had sold the land above with a water right in the stream to Smith. Three years after the execution of the deed to Gordon and Manville, at a point on the same stream above their lands and for the irrigation of the farm previously sold to Smith, upon which Estes afterwards filed as a homestead. Estes began to assert a separate and distinct right and to use the water for the irrigation of his homestead. Five years later, presumably for the purpose of further protecting and maintaining his claim to the water, he, at the diversion points, posted and recorded the notices mentioned. When considered under the issues, as pleaded, together with the fact that the Estes farm was being irrigated by the use of the ditches mentioned, that a large orchard had been planted, which, with crops of hay and grain, were necessarily being sustained by the use of the water of this stream, all which notices, with the other facts and circumstances stated, were sufficient to establish a disclaimer, under the covenants given, and bring home to the knowledge of the grantee full notice of the change in their relations: *Petrain* v. *Kiernan*, 23 Or. 455 (32 Pac. 158); *Horbach* v. *Boyd*, 64 Neb. 129 (89 N. W. 644). The testimony showing the open use of

49 OR.— 40

the water under the notices posted, growing crops, and general knowledge thereof in the vicinity, while not sufficient to establish ownership, was clearly competent as evidence for the purpose of establishing claim of ownership as well as to indicate open and adverse possession under this defense: *Petrain* v. *Kiernan,* 23 Or. 455 (32 Pac. 158) ; *Rowland* v. *Williams,* 23 Or. 515 (32 Pac. 402) ; *Boyce* v. *Cupper,* 37 Or. 256 (61 Pac. 642) ; *Eastern Oregon Land Co.* v. *Cole* (Or.) 92 Fed. 949 (35 C. C. A. 100) ; *Land Grant Co.* v. *Dawson,* 151 U. S. 586 (14 Sup. Ct. 458 : 38 *Fitzgerald* v. *Brewster,* 31 Neb. 51 (47 N. W. 475) ; *Maxwell* L. Ed. 279).

6. When it appears that there was an intention on the part of Estes to claim and hold possession of the use of the stream for a beneficial purpose, in defiance of any rights claimed by his grantees and their assigns, the statute commenced to run, if such intention was accompanied by acts of diversion sufficient to indicate a purpose to carry such determination into effect. We have evidence of such motive and purpose in the notices posted and recorded, together with the use of the water both prior and subsequently made. From that time (April 15, 1872) the character of his possession cannot be doubted, and from which date, if not before, the statute of limitations began to take effect.

7. If it appears that plaintiffs and their predecessors in interest permitted 10 years to elapse without regaining control, during which Estes was using the water, when needed, for irrigation and domestic use, then such delay vested a complete title thereto in Estes, and constituted an absolute bar to the maintenance of this suit, unless it is shown that such use was permissive, or that it was of such character as not to constitute an invasion of the rights of the lower proprietors, against whom he was claiming and asserting such right. From the time, therefore, that Estes openly manifested his intention by the notices and use of the water, as stated, whatever may have been the character of his possession before, his possession became adverse, and in no way could it then be found that he was holding in subserviency to the deed previously given. Being in actual possession and making constant use, when needed, of the necessary

amount, it required only an adverse claim, however wrongful it may have been, and however well he may have known that his rights were unfounded, to render the possession adverse, and as to whether such possession and use were either knowingly wrongful or without right is unnecessary to determine.

8. It is the office of the statute of limitations, as enacted by our legislatures, as well as recognized by the courts from earliest history on the subject, to prevent and avoid the uncertainty in titles and property rights which would necessarily exist if persons were permitted to wait until after a generation had passed away, taking with it the most capable witnesses, before questioning another's rights. It is therefore settled that title by adverse possession may be acquired regardless of the good faith of the claimant, if accompanied by even a pretense, commonly known as a claim of title. The principles here invoked on these points have long been recognized in this state: *Parker* v. *Metzger,* 12 Or. 407 (7 Pac. 518) ; *Joy* v. *Stump,* 14 Or. 361 (12 Pac. 929) ; *Coventon* v. *Seufert,* 23 Or. 548 (32 Pac. 508)·; *Oregon Const. Co.* v. *Allen Ditch Co.* 41 Or. 209 (69 Pac. 455: 93 Am. St. Rep. 701).

9. On this point, however, it will be observed that, while prior to the posting of the notices, Estes may not have had what is termed a color of title, yet he claimed under what was, to say the least, its equivalent, and held under circumstances furnishing strong evidence of good faith. He had married the occupant of the unsurveyed farm, and to preserve their holdings, when the public lands occupied by himself and family were surveyed, filed on the land as a homestead, receiving the government's receipt therefor. He testifies that it was not his intention, by the deed given plaintiffs' predecessors, to convey more than the surplus water, which testimony is admissible for the purpose of showing his intention when he made the diversion under his notices ; and, evidently believing it was only the surplus to which his grantees were entitled, and becoming a riparian proprietor on the stream by virtue of it being his homestead, he presumably considered his claim to be under a valid and existing right. While such claim was not conclusive against his grantees, these circum-

stances are entitled to great weight in determining the status of his claim at its inception, as to whether his possession was in subserviency of or adverse to others on the stream.

10. The adverse possession urged and established as a defense may be defeated by showing that such use was interrupted within the statutory period, or, in other words, that the use during the irrigation seasons for the statutory time, under the conditions named, was not continuous, or by proof that such use did not substantially interfere with plaintiffs' rights: *Britt* v. *Reed,* 42 Or. 76 (70 Pac. 1029).

11. While an adverse right cannot grow out of mere permissive enjoyment, the burden of proving possession thus claimed to have been held by such permission or subserviency is cast upon the party attempting to defeat such claim: *Coventon* v. *Seufert,* 23 Or. 548 (32 Pac. 508) ; *Rowland* v. *Williams,* 23 Or. 515 (32 Pac. 402) ; *Bauers* v. *Bull,* 46 Or. 60 (78 Pac. 757) ; *Horbach* v. *Boyd,* 64 Neb. 129 (89 N. W. 644). The same rule would necessarily apply to any other assertion made for the purpose of defeating the running of the statute, and it accordingly follows, after the showing made by defendant, that, in order to defeat his claim of adverse possession, the onus was upon plaintiffs to establish that the use by Estes was not continuous for the statutory period, as well as to establish, if reliance is had thereon, that the use by defendant and his grantor was not such as to constitute a substantial interference with their rights.

12. So far as appears in the record, the plaintiffs and their predecessors in interest at all times, since the open manifestation by Estes of his claim in 1872 to the waters of Washington Creek, actually needed all the water of this stream for domestic and irrigation purposes. Its use, therefore, by defendant and his grantor under such conditions constituted an invasion of the rights claimed by plaintiffs and their predecessors. It being incumbent upon the plaintiffs to show that the use of the water on the Estes farm did not substantially interfere with their wants, nor constitute an invasion of their rights, and there being no evidence in the record to that effect, but, on the contrary, it appearing that the use of the water was necessary, and that they

were deprived of its benefit by the Estes place for more than the 10-year period, the claim of adverse possession is clearly established, unless shown that the interruptions by plaintiffs' predecessors were sufficient to prevent the running of the statute in defendant's favor.

13. On this point it will be observed that no claim of interruption is asserted, nor attempted to be established, prior to the year 1884. No principle of law is better established than that, when title is once acquired by adverse possession for the statutory period, such title remains in the person so acquiring it as completely as if conveyed to him by deed from the owner: *Joy* v. *Stump,* 14 Or. 361 (12 Pac. 929). Therefore, after the title by such possession became complete, no interruptions were of any avail to plaintiffs, unless actual, open, exclusive, continuous and adverse, under claim of ownership for the statutory period: B. & C. Comp. § 4; *Pearson* v. *Dryden,* 28 Or. 350 (43 Pac. 166) ; *Oregon Const. Co.* v. *Allen Ditch Co.* 41 Or. 209 (69 Pac. 455: 93 Am. St. Rep. 701) ; *Sherman* v. *Kane,* 86 N. Y. 57. In this case, then, it is conclusively shown that Estes, under his adverse claim, had the continuous and uninterrupted use of the waters from 1872 to 1884, without interference by any one, and his claim and open assertion of right being established as commencing not later than 1872, it ripened into a complete title prior to 1884, of which he has not been divested.

14. It is urged, however, that his title had not then become fully vested, and that the temporary interruptions of his use of the water, after 1884, were sufficient to stop the running of the statute, that is, that the use did not continue, without interruptions, for any 10-year period. On that point it will be observed that none of the uses testified to by plaintiffs are shown to have been permanent, and none are claimed to have taken place at any time, except during June and July. It is the law that one person may establish a right to the use of water during one part of a year, while another may, at the same time, secure a perfect right to the use of the waters of the same stream for the remainder of the season: Long, Irrigation, § 61; *McCall* v. *Porter,* 42 Or. 49 (70 Pac. 820, 71 Pac. 976). It follows, then,

that, under the most favorable application of the testimony possible for plaintiffs, they have lost the rights which they or their predecessors may have had to the waters of Washington Creek by adverse possession of defendant and his grantor, unless it be during June and July of each year.

15. The question then arises: Were the interruptions of Estes' use of the waters, in the manner testified to by some of plaintiffs' witnesses, sufficient to prevent the running of the statute in his favor during those months? From the record it appears that much of the testimony relative to interference with his use was by parties farming the Rea place adjoining plaintiffs' lands, and whatever water may have been procured by them was used on that place. But since the right to the use of the water by the owners of the Rea farm is not involved in this suit, plaintiffs cannot avail themselves of any interference on the part of persons occupying those premises. The result of this proceeding must be determined with reference only to the parties involved here: *McCall* v. *Porter,* 42 Or. 49 (70 Pac. 820, 71 Pac. 976). As to the parties herein, the testimony of nearly all the witnesses indicates the water to have been taken by them from the Estes place without his knowledge, and that, when he discovered any interference, its use would be immediately reclaimed. A fair example of these interruptions, if they can be termed such, finds expression in the statement of some of plaintiffs' witnesses, to the effect that they would sometimes go up and cut the Estes dams, after which water would occasionally run a day, and again not that long; that when they went up and turned the water down or cut the dams they would not speak to Estes about it; or, as stated by Kennedy, that during the 13 years he was on the Gardner place he did without water most of the time on account of persons using it on the Estes farm, and "once in a great while" he would go up and tear dams out, and that when the water was thus obtained it would "probably come down one day and maybe not two hours," the effect of which was that it came near drying them out altogether.

16. Under Section 4, B. & C. Comp., plaintiffs cannot maintain the suit unless it appears that they or their predecessors

were seised or possessed of the property in question within 10 years immediately prior to the commencement of this proceeding: *Fellows* v. *Evans,* 33 Or. 30 (53 Pac. 491) ; *Maas* v. *Burdetzke,* 93 Minn. 295 (106 Am. St. Rep. 436: 101 N. W. 182).*

To gain possession it must be such a re-entry or recapture of the use of the water as can be turned complete. Possession by permission of Estes was insufficient for this purpose, and a mere temporary cutting of his dams without his knowledge, whether to his injury or not, would be insufficient. It would not be seriously contended if A. takes possession of land, fences it, constructs and occupies a residence thereon under a claim of ownership, etc., for 10 years, and B. at different short intervals forced himself onto the land, placing his tent there and remaining until discovered, or until dispossessed as soon as discovered, that such interference and possession would be sufficient to stop the running of the statute. In discussing the question as to whether an unsuccessful action in ejectment would toll the statute, it is given as the rule that "prosecutions, to stop the running of the statute, must be successful, and lead to a change of possession": *Moore* v. *Greene,* 60 U. S. (19 How.) 69 (15 L. Ed. 533). So it might also be said that an attempt to regain possession of a water right, the use of which had been under the actual control and in the possession of another, must be successful and lead to a change in its control before it can defeat such claim under the statute. In order to have affected the legal status of Estes as an adverse claimant, so as to prevent the statute from running, he must not only have had knowledge, actual or implied, that the interference was taking place, but there must also have been at least an implied yielding thereto; or, if not, then there should have been such an entry as would have challenged this right to such extent as would ordinarily have been termed successful, and not possession for merely such time as to enable Estes to learn of the removal of the dams and replace them: Angell, Water-

---

*NOTE.—As this case appears in 91 Pac. 286, 295, other authorities are cited on this point, but are omitted here by direction of the court.

                                                    REPORTER.

courses (6 ed.), § 211; *Workman* v. *Guthrie,* 29 Pa. 495 (72 Am. Dec. 654). The reason and spirit of our statute on the subject does not contemplate that slight interruptions will stop its running in favor of one, who, for all practical purposes, maintains possession of the property, for, if such rule should prevail, so far as applicable to the determination of water rights, it would, in effect, be a mere nullity.

17. Thus far we have examined only the question of estoppel urged by plaintiffs relative to the defense of adverse possession, relied upon by the defendant, thereby first considering the main points to which our attention has been directed by counsel for the contending parties. But, whether intended as a foundation upon which to base the defense of adverse possession, by way of indicating the origin of the "claim of right" of his grantor, or as a separate, complete and sufficient defense, defendant pleads and maintains that his claim is prior in time and superior in right to plaintiffs', and, these averments being consistent, it becomes immaterial as to which is intended. A similar allegation relative to priority of their appropriation is made and urged by plaintiffs. This feature, being essential to a complete determination of the effect of the question of estoppel under the issues and evidence relative thereto, will be considered. From the proof it appears that plaintiffs' rights, when considered with reference to their allegation of prior appropriation, independent of the Estes and Gordon deed, did not attach prior to 1875, if prior to 1884. Littlefield testified to having known the various farms on the creek continuously since 1862, and that he first saw ditches on plaintiffs' lands in 1875. The testimony of M. J. Hindman indicates that a garden was irrigated there in 1867, but from what source of water supply is not shown. The ditches observed, so far as appears, may have been constructed to catch the flow from springs testified to as being below defendant's points of diversion, some of which were on plaintiffs' lands.

It was incumbent upon plaintiffs, in order to avail themselves of this right, to clearly prove all the elements essential to a right under the doctrine of prior appropriation, and the evidence disclosed is insufficient to establish their diversion and appropria-

tion for that purpose earlier than 1884 (*Morgan v. Shaw,* 47 Or. 333 : 83 Pac. 534), unless the deed referred to is sufficient. In fact, it is not clear that plaintiffs are endeavoring to show an actual appropriation of the stream sufficient to maintain their rights in this respect, earlier than that year, except to the extent shown by the color of title beginning with Estes' deed, already considered. The defendant, however, clearly and without question establishes a diversion for his lands not later than the year 1872, and shows the application thereof to a beneficial use at all times since. It cannot be doubted, therefore, that the appropriation claimed by defendant is prior in time to plaintiffs' appropriation; but it is maintained that defendant should be and is estopped, by reason of his grantor's deed to their predecessors, from pleading any right or claim to the use of any water from Washington Creek as against them, not only by adverse possession, as heretofore discussed, but from pleading a prior right to its use. Estoppel, as here urged, is evidently based on the assumption that defendant, in relying on his claim as prior appropriator, does so on the theory that he obtained his right to divert the water by reason of the interest sold to Smith in 1864, which had its inception in the appropriation made on the Estes farm in 1863. Owing to there being no privity of estate between Estes and Smith, this claim cannot be maintained (*Low v. Schaffer,* 24 Or. 239 : 33 Pac. 678) ; but, notwithstanding Estes cannot tack his appropriation to Smith's rights, the diversion in his own right, as above stated, attached prior to that of defendant.

18. We are then confronted with the question: Can the defendant, notwithstanding such deed, avail himself of his claim in this respect? The doctrine of estoppel is intended to preclude fraud, and to that end imposes silence on a party, when in conscience and honesty he should not be allowed to speak: *Van Rensselaer v. Kearney,* 52 U. S. (11 How.) 297 (13 L. Ed. 703). As usually understood and applied, estoppel can be used only that the ends of justice may be subserved.

19. Then, when it is remembered that Estes and Dill conveyed only their inchoate title to the waters of Washington Creek,

which consisted only of such rights as a notice of location there-
of could give, which, so far as appears from the record, was but
a claim of right requiring due diligence for its complete devel-
opment, they transferred by their deed all they were able to
convey, and since, after receiving such conveyance, the grantees
neglected or failed to perfect the right thus granted, can it then
be said the ends of right and justice would be subserved by hold-
ing the grantors to account under their covenants of warranty
for the failure of the grantees to perform a duty imposed upon
them by law, and whose acts or nonaction the grantors could
not control, and over which they had no supervision? We think
not. To hold their grantors estopped to assert an after-acquired
title, under such conditions, would be to make estoppel a weapon
of injustice, rather than a shield to protect the wronged. When
the deed was given, the grantors warranted that, up to that
stage of the proceedings, there were no outstanding claims which
could defeat the rights therein conveyed, if diligently perfected.
The grantors warranted that they would hold up their end of
the log, but not that the grantees would not let theirs fall. At
the date of the deed the legal title to both land and water was
in the government. The grantors had but an inchoate right in
each, and both were subject to forfeiture either by intentional
abandonment or an act or failure to act, which the law implied
as such. The long delay after 1864, whether for 5 years or 20,
constituted an abandonment under the facts shown, and left all
rights thus forfeited subject to an appropriation by others:
*Seaweard* v. *Pacific Livestock Co.* 49 Or. 157 (88 Pac. 963).

Estes, in 1872, if not earlier, made such an appropriation as
vested in himself a complete right to the use of the stream to
the extent thus applied, and, unless estopped as claimed, the
rights of plaintiffs' predecessors became subsequent to this title
thus acquired by him, both in time and right; and it is immate-
rial whether he thought by his marriage to Mrs. Smith, in 1867,
he succeeded to the interest of the heirs of her former husband,
for he openly asserted and maintained his right as an appro-
priator, independent of any previous claim thereto. When the
deed was executed to Gordon and Manville, the grantees knew,
or were bound to know, as a matter of law, the extent of the title

conveyed; that the grantors had but an inchoate interest, requiring a duty to be performed on the part of the recipients, in order to carry into effect the right transferred to them—as much so as to the "squatter's rights" to the land described in the deed, the forfeiture of which, under like circumstances, would not have precluded the grantors from asserting an after-acquired title thereto.

20. The adjudications on this question are not numerous, but we feel fully warranted by the principles enunciated in the few decisions bearing on the question, as well as by the reasonableness and justice of the rule, in holding that an after-acquired title by the grantor will not inure to the benefit of the grantee, where the latter knew at the time of the transfer that the grantor had no title and did not expect him to procure one, or where the title purported to be conveyed is an inchoate interest, the completion or forfeiture of which depends upon some acts to be performed, or diligence to be exercised by the grantee. We find no authorities to the contrary, and supporting this rule are *Viele* v. *Van Steenberg* (C. C.) 31 Fed. 249; *Goodel* v. *Bennett,* 22 Wis. 565; *Wallace* v. *Pereles,* 109 Wis. 316 (85 N. W. 371: 53 L. R. A. 644: 83 Am. St. Rep. 898); *Altemus* v. *Nickell,* 115 Ky. 506 (74 S. W. 221: 103 Am. St. Rep. 333). It follows that defendant is not estopped to claim either as an owner through his grantor by prior appropriation, or by adverse possession for the statutory period, and, when both claims are considered in connection with the facts disclosed, it conclusively appears that defendant has acquired a right to the use of sufficient water from Washington Creek to properly irrigate the amount of lands heretofore cultivated, amounting to not less than 60 acres.

21. As to the quantity of water, however, to which he is entitled for this purpose, it is not so clear. Witnesses for plaintiffs testify that their farms have consumed all the stream will furnish, when it could be procured, and that all of it has been and is necessary. Defendant and his witnesses also indicate that all has been necessary for and applied in the irrigation of his premises. In this respect they give only their opinion, without stating the facts from which their conclusions are inferred; but as it is shown, and not controverted, that the lands along Wash-

ington Gulch require from an inch to an inch and a half of water per acre for their proper cultivation it will be presumed that this amount is sufficient, and the apportionment will be on this basis, notwithstanding the opinion of defendant's witnesses that the Estes farm requires all the water in the stream. It being shown, and not questioned, that defendant has between 60 and 70 acres of land in cultivation, including orchard, upon which good crops have been raised each year, it will be assumed that a flow of 60 inches of water is ample for defendant's irrigation and domestic requirements: *Morgan* v. *Shaw,* 47 Or. 333 (83 Pac. 534).

22. The record is silent as to the quantity of water understood by the use of the word "inch"; but it has been held that, when the record fails to disclose the amount intended by such designation, it will be presumed that it was to be measured under a six-inch pressure: *Morgan* v. *Shaw,* 47 Or. 333 (83 Pac. 534); *Bowman* v. *Bowman,* 35 Or. 279 (57 Pac. 546). This designation, however, is not sufficiently definite to be a safe guide at all times in ascertaining when the rights of a person awarded a given number of inches under six-inch pressure, etc., are being invaded. In speaking of the measurements of water in use in California, Mr. William Kent, in his recent reference book for use by engineers and mechanics, states the situation thus: "The term 'miner's inch' is more or less indefinite, for the reason that California water companies do not all use the same head above the center of the aperture, and the inch varies from 1.36 to 1.73 cubic feet per minute each; but the most common measurement is through an aperture two inches high and whatever length is required, and through a plank $1\frac{1}{4}$ inches thick. The lower edge of the aperture should be two inches above the bottom of the measuring box and the plank five inches above the aperture, thus making a six-inch head above the center of the stream. Each square inch of this opening represents a miner's inch (under six-inch pressure) which is equal to a flow of $1\frac{1}{2}$ cubic feet per minute." See, also, Wiel, Water Rights, pp. 147, 175; Newell's (Practical) Irrigation, p. 128; Troutwine, Civil Engineering, p. 546; Merriman's Treatise on Hydraulics (1904) pp. 122,

123, 124; Mill's Irr. Manual §§ 88-92, inclusive; *Dougherty* v. *Haggin,* 56 Cal. 522.

It is evident that the only reliable method by which any certain number of inches of water, when awarded under this method of measurement, can always be determined, is on the basis of what is termed by engineers as "second feet," or quantity of water flowing past a certain point in a given space of time. The ratio recognized by the authorities cited and rule quoted is that one inch of water under six-inch pressure equals one-fortieth of a "second foot"—that is, 40 miner's inches furnish a flow of water equal to one cubic foot ($7\frac{1}{2}$ gallons) per second of time—which ratio we find substantially accurate, and will be adopted here. "Inches" of water, when unexplained, having been determined to have reference to the quantity so designated under six-inch pressure (*Bowman* v. *Bowman,* 35 Or. 279 : 57 Pac. 546), it follows that defendant, having from 60 to 70 acres of cultivated land requiring irrigation, is entitled as a first right to the use of 60 inches of the waters of Washington Creek for irrigation and domestic use.

23. As to any water in excess of his actual requirements, as here awarded, including the quantity of water that may pass below defendant's lands after its use thereon, plaintiffs have acquired a right thereto, at such times as needed by them for the purposes stated, as against defendant: *Seaweard* v. *Pacific Livestock Co.* 49 Or. 157 (88 Pac. 963). And, as between the parties, plaintiffs and defendant herein, at all times that the water is not required by one of them, it should be at the disposal of the other, for irrigation and domestic use, when needed: *Mann* v. *Parker,* 48 Or. 321 (86 Pac. 598).

24. The trial court being invested with discretionary powers in taxation of costs, in the exercise of which there appears no abuse, the decree in that respect should not be disturbed; but the cross-appeal appearing justifiable on the part of defendant, he should be allowed his costs in this court.

The decree of the circuit court should be modified and one entered in conformity with this opinion.  MODIFIED.

Mr. Justice EAKIN having tried the cause in the court below did not sit in this case.